1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10
                          ----oo0oo----
11

12  SIERRA NEVADA FOREST
    PROTECTION CAMPAIGN, PLUMAS
13  FOREST PROJECT EARTH ISLAND
    INSTITUTE; and CENTER FOR
14  BIOLOGICAL DIVERSITY, non-
    profit organizations,
15                                 NO. CIV. S 04-2023 MCE GGH

16          Plaintiffs,

17     v.                          MEMORANDUM AND ORDER

18  UNITED STATES FOREST SERVICE;
    JACK BLACKWELL, in his
19  official capacity as Regional
    Forester, Region 5, United
20  States Forest Service; and
    JAMES M. PEÑA,
21
            Defendants.
22                        ----oo0oo----

23

24      In instituting this litigation, Plaintiffs Sierra Nevada

25  Forest Protection Campaign, Plumas Forest Project Earth Island

26  Institute, and Center for Biological Diversity (hereinafter

27  collectively referred to as "Plaintiffs") challenge the decision

28  by Defendants United States Forest Service, Jack Blackwell, and

                              1

1   James Peña (hereinafter "Forest Service") to proceed with
2   implementation of the logging and fuel treatments contemplated by
3   the Meadow Valley Project ("MVP").  Specifically, Plaintiffs
4   assert that the Forest Service's approval of the project without
5   preparation of an Environmental Impact Statement ("EIS") violated
6   the provisions of the National Environmental Protection Act, 42
7   U.S.C. § 4321, et seq. ("NEPA").  Plaintiffs further assert that
8   the project, as designed, fails to achieve fire resilient forests
9   despite being contemplated to do so.  Finally, Plaintiffs contend
10  the Forest Service failed to specifically mark trees for removal
11  pursuant to the MVP in violation of the National Forest
12  Management Act, 16 U.S.C. § 472a(g). ("NFMA").

13          Plaintiffs now move for summary judgment on grounds that the
14  administrative record establishes, as a matter of law, that an
15  EIS should have been prepared, that the project was be redesigned
16  to achieve fire resilience, and that the Forest Service must mark
17  all trees as required by the NFMA.  The Forest Service has
18  responded with its own motion for summary judgment.  The Forest
19  Service argues that the MVP in fact meets all federal
20  requirements and that an EIS is consequently unnecessary.

21          For the reasons stated below, summary judgment in favor of
22  the Forest Service will be granted, and Plaintiffs' motion will
23  be denied.

24
25                          **FACTUAL BACKGROUND**
26
27      This case arises from the Herger-Feinstein Quincy Library
28  Group Forest Recovery Act of 1998 ("QLG Act" or "Act"), pursuant

1   to which Congress directed the Secretary of Agriculture to

2   conduct a pilot project involving construction of a strategic

3   system of defensible fuel profile zones ("DFPZs") and group

4   selection logging designed "to achieve a desired future condition

5   of all-age, multistory, fire resilient forests."  QLG Act, Pub L.

6   105-277, Div. A. [Title IV, Sec. 401], Oct. 21, 1998, 122 Stat.

7   2681-305 (16 U.S.C. § 2104 note), § 401(b), (d).  Pursuant to the

8   QLG Act, a pilot project area is to be implemented on

9   approximately 1.5 million acres within the Plumas and Lassen

10  National Forests and the Sierraville Ranger District of the Tahoe

11  National Forest.

12      In implementing the QLG Act, Congress exempted the habitat

13  of the California spotted owl.  The California spotted owl is a

14  medium sized raptor inhabiting the Sierra Nevada mountain range

15  from Shasta County south to Kern County.  The California spotted

16  owl has not been classified as either threatened or endangered

17  under the Endangered Species Act of 1973 ("ESA").  *See* 68 Fed

18  Reg. 7580, 7608 (Feb. 14, 2003) (denying petition to list the

19  owl).  The California spotted owl has, however been designated as

20  a "sensitive" species due to concerns regarding its viability (13

21  AR[1] 4822) as the old forest conditions it prefers (typified by

22  large trees, dense and multi-layered forest canopies, large

23  standing dead trees ("snags") and downed logs and woody debris)

24  have been depleted through logging, development and related

25

26

27      [1]Designations to the "AR" throughout this Memorandum and
    Order refer to the Administrative Record designated by the
28  parties.

-3-

1   activities.  *See* 10 AR 03838.[2]  Because its population changes
2   are believed to indicate the effects of forest management
3   practices on other species dependent on old forest habitat, the
4   California spotted owl has also been designated as a "management
5   indicator species" for the Plumas National Forest.  13 AR 4798-
6   99.

7       In a 1999 Final Environmental Impact Statement ("FEIS") for
8   the QLG Act pilot project on a programmatic basis, the Forest
9   Service concluded that the construction of fuel treatments as
10  envisioned by the Act would reduce the amount of California
11  spotted owl nesting habitat by 7 percent and the amount of owl
12  foraging habitat by an additional 8.5 percent, for a total
13  reduction of 15.5 percent of suitable owl habitat within the
14  pilot project area.  7 AR 2581.

15      In the Record of Decision ("ROD") that accompanied the 1999
16  FEIS, the Forest Service recognized that a 15.5 percent reduction
17  in California spotted owl habitat "could pose a serious risk to
18  the viability of the California spotted owl in the planning area,
19  thereby making the implementation of [the selected alternative]
20  inconsistent with the National Forest Management Act."  7 AR
21  2384.  The Forest Service concluded that "additional mitigation
22  must be applied... in order to provide sufficient protection to
23  the California spotted owl." 7 AR 2388.  Consequently, as a
24  mitigation measure, the Forest Service required that "[a]t the
25  site-specific level, defensible fuel profile zones, group
26
27      [2]Nonetheless, within the approximately 7.37 million acres of
    forested land within the Sierra Nevada, some 4.12 million acres
    is considered potentially suitable habitat for the spotted owl.
28  4 AR 1402.

-4-

1  selection harvest areas, and individual tree selection harvest
2  areas will be designed and implemented to completely avoid
3  suitable California spotted owl habitat, including nesting
4  habitat and foraging habitat."  7 AR 2383.  The 1999 ROD provided
5  only programmatic direction in this regard, and specified that
6  all project-level decisions must be implemented "after site-
7  specific environmental analysis and review."  Id.

8      In 2001, the Sierra Nevada Forest Plan, which provides a
9  comprehensive management strategy for all eleven national forests
10  within the Sierra Nevada range, was amended.  In addressing the
11  maintenance of old forest ecosystems and species associated with
12  those ecosystems, the ROD adopting the amendment imposed
13  requirements for managing the California spotted owl.  The ROD
14  established Protected Activity Centers ("PACs"), which consisted
15  of 300 acres around each known owl nest or roosting site.  In
16  addition, 1,000 acre Home Range Core Areas ("HRCAs") were set
17  aside in conjunction with each PAC.  The 2001 ROD imposed
18  additional requirements on timber harvest, including diameter
19  limits and requirements for snag retention and forest canopy
20  closure.

21      Following adoption of the 2001 Sierra Nevada Forest Plan
22  Amendment ("2001 SNFPA"), the Forest Service determined that
23  additional review was needed to determine how to implement the
24  QLG pilot project to the fullest extent possible.  The year-long
25  public review which ensued culminated with the issuance of new
26  management recommendations in March of 2003.  The resulting SNFPA
27
28

-5-

1  Management Review and Recommendations ("MRR")[3] determined that
2  the 2001 ROD "severely limits" implementation of the QLG project
3  by precluding DFPZs and group selection areas.  *See* MRR at 6.
4  The review further determined that a new California spotted owl
5  analysis was warranted, and concluded that studies leading to the
6  2001 ROD unnecessarily "took a worst case approach to estimating
7  effects" on the California spotted owl.  MRR at 55.  In
8  particular, the 2003 review found that fuel reduction thinnings
9  entailed by DFPZ construction in owl nesting habitat actually
10 reduced that habitat by less than one percent in treated acreage,
11 as opposed to the 100 percent impact assumed by prior analysis.
12 Id.  Consequently the prior assessment was determined to be
13 unduly conservative.  *See* id.

14      Following receipt of the aforementioned MRR, an additional
15 programmatic Environmental Impact Statement was prepared.  The
16 ensuing 2004 ROD, which replaced the 2001 ROD in its entirety,
17 amended the Sierra Nevada Forest plans. ("2004 SNFPA").  The 2004
18 SNFPA revised the analysis of likely effects to the California
19 spotted owl, and allowed for full implementation of the QLG Act.
20 *See* 4 AR at 1055-56.  Nonetheless, under the terms of the 2004
21 SNFPA, site-specific projects must still be scrutinized for their
22 particular environmental impact, if any.

23      The Meadow Valley project at issue in this litigation
24 ("MVP") is one such site-specific project.  The MVP, approved by
25 the Forest Supervisor for the Plumas National Forest on April 16,

26 ─────────────────

27      [3]A complete copy of the MRR is attached to the Forest
   Service's Second Errata to Memorandum in Support of Cross Motion
28 for Summary Judgment.

1  2004, is part of the QLG pilot project and involves logging of
2  about 40 million board feet of timber from approximately 6,440
3  acres in a 50,400 acre area over a five-year period.  The MVP is
4  located within the Mount Hough Ranger District, Plumas National
5  Forest, and is located approximately five miles west of Quincy,
6  California.  The project surrounds the community of Meadow
7  Valley.

8      The group selection aspect of the MVP involves 743 acres in
9  488 units scattered throughout the project area.  13 AR 4760.
10  The contemplated group selection units range in size from one-
11  half to two acres, and entails removal of trees up to 30 inches
12  in diameter at breast height ("dbh"). 12 AR 4346, 4350.  Although
13  this logging would significantly reduce forest canopy cover in
14  the areas involved, the Forest Service maintains that the broad
15  dispersal of the units themselves would still maintain relatively
16  continuous forest cover within the stand as a whole, and would
17  therefore ensure habitat connectivity for wildlife species
18  dependent on old forest conditions.  At the same time, according
19  to the Forest Service, opening the forest canopy in the group
20  selection units permits the reforestation of shade-intolerant
21  species like the ponderosa pine and hence contributes to forest
22  diversity and the recreation of pre- European settlement
23  conditions.

24      In addition to the group selection areas, the MVP also calls
25  for approximately 5,700 acres of DFPZ logging in 37 units.  13 AR
26  4760-63.  DFPZs are long strips, up to a quarter mile in width,
27  that generally follow ridgetops or roadway areas.  DFPZs are
28  designed to provide breaks that reduce the possibility of

-7-

1  catastrophic crown fire destroying the forest canopy.  *See* 13 AR

2  4824; 12 AR 4433-4455.   Within DFPZ units, trees larger than

3  20" dbh would be retained in approximately 82 percent of the

4  units, and trees larger than 30" would generally be retained in

5  all units, along with snags and large logs.  13 AR 4793; 15 AR

6  5498.  No minimum canopy cover is required in DFPZs unless the

7  area slated for treatment had more the 40 percent canopy cover

8  beforehand, in which case that cover would be retained.  That

9  cover requirement, however, applies to only some 978 acres of the

10 total 5,700 acres contemplated as DFPZs.  S*ee* 15 AR 5498.

11     For both group selection and DFPZ units, the MVP calls for

12 treatment of activity-related fuels (slash) through either piling

13 and burning, underburning or mastication of this logging-related

14 debris so as to ensure acceptable levels of residual fuel

15 loading.  *See* 15 AR 5480, 13 AR 4884.  Completion of the group

16 selection and DFPZ units, including slash treatment, is

17 contemplated to occur within five years after project contracts

18 are awarded.  *See* 13 AR 4764.   With regard to group selection

19 units, the trees to be logged are designated by description, as

20 opposed to individual marking of specified trees.  16 AR 5754.

21     According to the Forest Service, implementation of the MVP

22 meets the objectives of the QLG Act by achieving an all-aged

23 mosaic of timber stands that contributes to the local economy

24 through a sustainable output of forest products, and at the same

25 time comprises a fuel treatment network necessary to reduce the

26 potential risk of future wildfires, provide for increased

27 firefighter safety, and protect the community of Meadow Valley in

28

                              -8-

the event of a wildfire.[4]  13 AR 4771-72.

With respect to California spotted owl habitat, no MVP activity is contemplated in either PACs or Spotted Owl Habitat Areas ("SOHAs").  13 AR 4824.  SOHAs are defined as designated stands of owl habitat, comprising at least 1,000 acres, that are located within a 1.5 mile radius of a nesting site.  Consequently SOHAs are less inclusive than HRCAs, which by definition encompass 1,000 acres immediately around the 300 acre PAC stands surrounding a California spotted owl nesting or roosting site. Using these strictures, the project EA determined that some 96 percent of the combined acreage of PACs and HRCAs within the wildlife analysis area (85,919 acres) would not be treated.  Id.

The actual MVP area itself, however, contains some 945 acres of suitable California spotted owl nesting habitat and 3,336 acres of suitable foraging habitat.  12 AR 4367-68.  Those 4,281 acres of suitable owl habitat comprise some 67 percent of the project area's 6400 acres, but only 9.6 percent of total suitable habitat within the wildlife analysis area as a whole.  12 AR 4367.  The proposed MVP project would log portions of some 16 HRCAs.  12 AR 4428.  The Forest Service has acknowledged that MVP logging may render unsuitable nearly all 4,281 acres of nesting (94.6 percent) and foraging (86.6 percent) habitat in the project area.  12 AR 4439-40.  Nonetheless, the Biological Assessment/Biological Evaluation for the MVP ("BA/BE") concluded

---

[4]In 1999 and 2000, four fires occurred in the vicinity of Meadow Valley.  Two of those fires, the so-called Pidgeon and Lookout Fires, entered the area contemplated for treatment under the MVP and threatened the community of Meadow Valley.  See Intervenors' Response to Pls.' Mot. for Summ J., pp. 5-6

that owl occupancy is not expected to diminish within the wildlife analysis area as a whole and a cumulative population loss is not anticipated with implementation of the MVP.  12 AR 4438.

After considering an environmental assessment ("EA") of the project, the adoption of Alternative C (which allowed the most logging/fuel treatment in the project area) was approved.  15 AR 5493.  Because the Forest Service concluded that the action being proposed would not result in significant environmental effects, a Finding of No Significant Impact ("FONSI") was issued and no EIS was required.  Plaintiffs now challenge that decision by way of this lawsuit,[5] and ask that a full EIS be prepared before the project is commenced.

Specifically, Plaintiffs take issue with the Forest Service's description of the project as achieving fire resilient forest, claiming that to the contrary the risk of severe fire is actually increased by the activity being contemplated.  In addition, Plaintiffs claim that the proposed actions will also adversely affect California spotted owl viability.  Moreover, Plaintiffs assert that Plaintiffs have failed to adequately disclose and consider the cumulative impacts of the project when considered together with other past, present, and planned timber sales in the project area.

As indicated above, Plaintiffs contend that these shortcomings all run afoul of NEPA, and go on to identify an NFMA

_____

[5]It is undisputed that Plaintiffs filed timely administrative appeals of the Forest Service decision prior to commencement of this action (15 AR 6564-60, 5681-708) and that those appeals were subsequently denied.  15 AR 5739-52.

-10-

violation on grounds that timber cutting by designation, as
contemplated by the MVP, is not permitted and that individual
marking, by Forest Service employees, of trees to be logged, must
instead occur.

## PROCEDURAL FRAMEWORK

Congress enacted NEPA in 1969 to protect the environment by
requiring certain procedural safeguards before an agency takes
action affecting the environment.  The NEPA process is designed
to "ensure that the agency ... will have detailed information
concerning significant environmental impacts; it also guarantees
that the relevant information will be made available to the
larger [public] audience." Blue Mountains Biodiversity Project
v. Blackwood, 171 F.3d 1208, 121 (9th Cir. 1998).  The purpose of
NEPA is to "ensure a process, not to ensure any result." Id.
"NEPA emphasizes the importance of coherent and comprehensive up-
front environmental analysis to ensure informed decision-making
to the end that the agency will not act on incomplete
information, only to regret its decision after is it too late to
correct." Center for Biological Diversity v. United States
Forest Service, 349 F.3d 1157, 1166 (9th Cir. 2003).

NEPA requires that all federal agencies, including the
Forest Service, prepare a "detailed statement" that discusses the
environmental ramifications, and alternatives, to all "major
Federal Actions significantly affecting the quality of the human
environment."  42 U.S.C. § 4332(2)[C].  To determine whether this
detailed statement (commonly referred to as an EIS) is required,

-11-

1  an agency may first prepare an environmental assessment ("EA").

2  The objective of an EA is to "[b]riefly provide sufficient

3  evidence and analysis to determining whether to prepare" an EIS.

4  40 C.F.R. § 1508.9(a)(1).  If the EA indicates that the federal

5  action may significantly affect the quality of the human

6  environment, the agency must prepare an EIS.  40 C.F.R. § 1501.4;

7  42 U.S.C. § 4332(2)[C].

8      In the event an agency determines that an EIS is not

9  required, it must, as the Forest Service did here, issue a FONSI

10  detailing why the action "will not have a significant effect on

11  the human environment."  40 C.F.R. § 1508.13.  As is customary,

12  the FONSI in this case is contained within the project EA.  The

13  EA must support the agency's position that a FONSI is indicated.

14  Blue Mountains, 161 F.3d as 1214.

15      Whether there may be a significant effect on the human

16  environment requires consideration of two broad factors, context

17  and intensity.  As the Ninth Circuit explained in Nat'l Parks &

18  Conservation Ass'n v. Babbitt, 241 F.3d 722, 730 (9th Cir. 2001):

19      "Context simply delimits the scope of the agency's action,
        including the interests affected.  Intensity relates to the
20      degree to which the agency action affects the locale and
        interests identified in the context part of the inquiry."
21
22      NEPA regulations provide relevant factors for evaluating

23  intensity, including, inter alia:

24      (2) The degree to which the proposed action affects public
        health and safety.
25      ...

26      (4) The degree to which the effects on the quality of the
        human environment are likely to be highly controversial.

27      (5) The degree to which the possible effects on the human
        environment are highly uncertain or involve unique of
28      unknown risks.

-12-

1      ...

2      (7) Whether the action is related to other actions with
       individually insignificant but cumulatively significant
3      impacts.  Significance exists if it is reasonable to
       anticipate a cumulatively significant impact on the
4      environment.  Significance cannot be avoided by terming an
       action temporary or by breaking it down into small component
5      parts.

6      ...

7      (9) The degree to which the action may adversely affect an
       endangered or threatened species or its habitat that has
8      been determined to be critical under the Endangered Species
       Act of 1973.

9      40 C.F.R. § 1508.27(b).

10     The presence of one such factor may be sufficient to deem

11     the action significant in certain circumstances.  Ocean Advocates

12     v. United States Army Corps. Of Eng'rs, 361 F.3d 1108, 1125 (9th

13     Cir. 2004).  If substantial questions are raised as to whether a

14     project may have a significant effect on the environment, an EIS

15     should be prepared.  Save the Yaak Committee v. Block, 840 F.2d

16     714, 717 (9th Cir. 1988).  "An agency's decision not to prepare

17     an EIS will be considered unreasonable if the agency fails to

18     supply a convincing statement of reasons why potential effects

19     are insignificant."  Id.

20     In addition to arguing that the Forest Service violated NEPA

21     by failing to prepare an EIS in this case, Plaintiffs also

22     contend that the Forest Service's designation of trees to be cut

23     by designation, as opposed to individual marking, violates the

24     NFMA, which requires that "resource plans and permits, contracts,

25     and other instruments for the use and occupancy of National

26     Forest Systems lands shall be consistent with the land management

27     plans."  16 U.S.C. § 1604(i).  Consequently, all activities in

28     Forest Service forests, including timber projects, must be

                                    -13-

1  determined to be consistent with the governing forest plan, which

2  is a broad, programmatic planning document.  *See, e.g.,*

3  Wilderness Society v. Thomas, 188 F.3d 1130, 1132 (9th Cir.

4  1999).

5       Because neither NEPA nor NFMA contains provisions allowing a

6  private right of action (*see* Lujan v. National Wildlife

7  Federation, 497 U.S. 871, 882 (1990) and Ecology Center Inc. v.

8  United States, 192 F.3d 922, 924 (9th Cir. 1999) for this

9  proposition under NEPA and NFMA, respectively), a party can

10  obtain judicial review of alleged violations of NEPA and NFMA

11  only under the waiver of sovereign immunity contained within the

12  Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

13       Under the APA, the court must determine whether, based on a

14  review of the agency's administrative record, agency action was

15  "arbitrary and capricious", outside the scope of the agency's

16  statutory authority, or otherwise not in accordance with the law.

17  Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1356

18  (9th Cir. 1994).  Review under the APA is "searching and

19  careful."  Ocean Advocates, 361 F.3d at 1118.  However, the court

20  may not substitute its own judgment for that of the agency.  Id.

21  (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401

22  U.S. 402 (1971), overruled on other grounds by Califano v.

23  Sanders, 430 U.S. 99 (1977)).

24       In reviewing an agency's actions, then, the standard to be

25  employed by the court is decidedly deferential to the agency's

26  expertise.  Salmon River, 32 F.3d at 1356.  Although the scope of

27  review for agency action is accordingly limited, such action is

28  not unimpeachable.  The reviewing court must determine whether

-14-

1  there is a rational connection between the facts and resulting

2  judgment so as to support the agency's determination.  <u>Baltimore</u>

3  <u>Gas and Elec. v. NRDC</u>, 462 U.S. 87, 105-06 (1983), *citing* <u>Bowman</u>

4  <u>Trans. Inc. v. Arkansas-Best Freight System Inc.</u>, 419 U.S. 281,

5  285-86 (1974).  In short, the court must ensure that the agency

6  has taken a "hard look" at the environmental consequences of its

7  proposed action.  <u>Oregon Natural Resources Council v. Lowe</u>, 109

8  F.3d 521, 526 (9th Cir. 1997).

9

10            **AUGMENTATION OF THE ADMINISTRATIVE RECORD**

11

12       The Forest Service has moved to strike certain evidence

13  offered by Plaintiffs in conjunction with the summary judgment

14  motions presently before the Court.  Specifically, the Forest

15  Service asserts that because the Declarations of Monica Bond,

16  Jennifer Blakesley, and Dennis Odion, along with the Supplemental

17  Declaration of Chad Hanson, were not part of the underlying

18  administrative record they should be disregarded.  Defendants

19  make the same argument with regard to certain attachments to the

20  Declaration of George Torgun.  In response, Plaintiffs have not

21  only argued that inclusion of the above materials is appropriate,

22  but they have also moved to supplement the record to include

23  several additional items (a supplemental declaration from Dennis

24  Odion, the Declaration of Don C. Erman, and four attachments to

25  the Declaration of Rachel M. Fazio).

26       The Forest Service correctly points out that "the focal

27  point for judicial review should be the administrative record

28  already in existence, not some new record made initially in the

-15-

1  reviewing court." Camp v. Pitts, 411 U.S. 138, 142 (1973);

2  Southwest Ctr. for Biological Diversity v. U.S. Forest Serv., 100

3  F.3d 1443, 1450 (9th Cir. 1996).  The rationale for this general

4  rule is that the reviewing court should determine agency

5  compliance with the law solely on the record before the agency at

6  the time of its decision. *See* Citizens to Preserve Overton Park,

7  Inc. v. Volpe, 401 U.S. 402, 419 (1971).  Limiting review in that

8  regard precludes the reviewing court from conducting a *de novo*

9  trial and substituting its opinion for that of the agency. *See*

10  id. at 416.

11       Consideration of extra-record evidence may nonetheless be

12  justified (1) if necessary to determine "whether the agency has

13  considered all relevant factors and has explained its decision";

14  (2) if "the agency has relied on documents not in the record";

15  (3) "when supplementing the record is necessary to explain

16  technical terms or complex subject matter"; or (4) when

17  plaintiffs make a showing of agency bad faith." Lands Council v.

18  Powell, 379 F.3d 738, 747 (9th Cir. 2004).  These exceptions

19  "operate to identify and plug holes in the administrative

20  record." Id.

21       The Blakesley, Bond, Odion and Hanson declarations all

22  consist of scientific opinion testimony criticizing the adequacy

23  of the Forest Service's analysis of MVP effects on the California

24  spotted owl and on fire risk.  These declarations all pertain to

25  Plaintiffs' claim that significant environmental impacts were

26  ignored in the MVP EA, and that consequently, the provisions of

27  NEPA were violated.  The Odion declaration, for example, relates

28  to the sufficiency of the Forest Service's analysis of project

-16-

fire risk, and purports to explain complex matters dealing with the science of fire risk. Hence the Odion declaration falls within the first and third exceptions to the administrative record review as articulated by the Ninth Circuit in <u>Lands Council</u>.

The Blakesley and Bond declarations argue that the Forest Service failed to sufficiently consider the effects of the project on the California spotted owl, and hence pertain to Plaintiffs' NEPA claim as well. The attachments to the Torgun Declaration also relate to Plaintiffs' assertion, under NEPA, that cumulative effects of the MVP were not properly considered.[6] The same arguments apply to the additional declarations and evidence that Plaintiffs separately request be included within the administrative record.

In cases challenging the adequacy of agency review under NEPA, the Ninth Circuit has routinely admitted extra-record evidence to show that the agency failed to consider all relevant factors in assessing potential environmental effects. *See, e.g.,* <u>Idaho Conservation League v. Mumma</u>, 956 F.2d 1508, 1520 n. 22 (9th Cir. 1992); <u>City of Davis v. Coleman</u>, 521 F.2d 661, 675 (9th Cir. 1975); <u>Natural Resources Defense Council v. Duvall</u>, 777 F. Supp. 1533, 1534 n. 1 (E.D. Cal. 1991). In <u>Environment Now! v. Espy</u>, 877 F. Supp. 1397, 1404 (E.D. Cal. 1994), this district permitted expert declarations in order to highlight perceived

_____

[6]Although of more attenuated relevance to the <u>Lands Council</u> factors as delineated above, the supplemental Hanson declaration is offered to aid the Court, through photographs, in understanding Plaintiffs' argument that some units within the project area had previously been adequately treated for fire risk reduction. It will be accepted on that basis.

deficiencies in the environmental review process and to explain
and assist understanding the complex and technical subject matter
underlying the agency decision at issue.

This liberality in allowing consideration of material beyond
the record makes sense given the fact that NEPA requires the
court to make a "substantial inquiry" into the nature of a
federal agency's NEPA compliance.  *See* Citizens to Preserve
Overton Park v. Volpe, 401 US. at 415.  As the Ninth Circuit
pointed out in Asarco Inc. v. United States Environmental
Protection Agency, 616 F.2d 1153, 1160 (9th Cir. 1980), "it will
often be impossible, especially when highly technical matters are
involved, for the court to determine whether the agency took into
consideration all relevant factors unless it looks outside the
record to determine what matters the agency should have
considered but did not."

Given these considerations, and because the materials at
issue herein all relate to NEPA claims, they will be considered
by this Court.  Consequently, the Forest Service's Motion to
Strike is denied and Plaintiffs' request to augment the record is
granted.

**STANDARD OF REVIEW**

The Federal Rules of Civil Procedure provide for
summary judgment when "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with
affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a judgment

as a matter of law." Fed. R. Civ. P. 56(c).  One of the
principal purposes of Rule 56 is to dispose of factually
unsupported claims or defenses.  <u>Celotex Corp. v. Catrett</u>, 477
U.S. 317, 325 (1986).  Under summary judgment practice, the
moving party

> "always bears the initial responsibility of informing the
> district court of the basis for its motion, and identifying
> those portions of 'the pleadings, depositions, answers to
> interrogatories, and admissions on file together with the
> affidavits, if any,' which it believes demonstrate the
> absence of a genuine issue of material fact."

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting Rule
56[c].

If the moving party meets its initial responsibility, the
burden then shifts to the opposing party to establish that a
genuine issue as to any material fact actually does exist.
<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574,
585-587 (1986); <u>First Nat'l Bank v. Cities Ser. Co.</u>, 391 U.S.
253, 288-289 (1968).

In attempting to establish the existence of this factual
dispute, the opposing party must tender evidence of specific
facts in the form of affidavits, and/or admissible discovery
material, in support of its contention that the dispute exists.
Fed. R. Civ. P. 56(e).  The opposing party must demonstrate that
the fact in contention is material, i.e., a fact that might
affect the outcome of the suit under the governing law, and that
the dispute is genuine, i.e., the evidence is such that a
reasonable jury could return a verdict for the nonmoving party.
<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 251-52
(1986).

-19-

Summary judgment is appropriate in cases, like the present matter, which involve judicial review of administrative action where review is based upon an administrative record. <u>National Wildlife Fed'n v. Babbitt</u>, 128 F. Supp. 2d 1274, 1289 (E.D. Cal. 2001), *see also* <u>Northwest Motorcycle Ass'n v. U.S. Dept. Of Agriculture</u>, 18 F.3d 1468 (9th Cir. 1994).

**ANALYSIS**

A.  Impact on the California Spotted Owl

The parties do not dispute that the California spotted owl is a territorial species that preferentially utilizes habitat near and around its nest tree. Plaintiff's Undisputed Fact ("PUF") No. 20. For that reason, 300 acres have been set aside as PACs around each nesting site. The MVP leaves those PACs completely intact, and further leaves intact an additional 1,000 acres of foraging area, or SOHA, within a 1.5 mile radius of each nesting site. 15 AR 5497.

It is the MVP's impact on the HRCAs, which as stated above are the 700 acres immediately surrounding each PAC, that is at issue. As indicated above, sixteen HRCAs located within the MVP area would be impacted by the proposed logging. 12 AR 4368. Approximately one-third of the MVP group selection areas are located within HRCAs, some directly adjacent to owl PACs. 12 AR 4489. Given the Forest Service's admission that all of the 4,281 acres of suitable owl habitat falling within the project

1  area could be rendered unsuitable by the MVP (PUF No. 50; 12 AR

2  4439-40), Plaintiffs contend that such impact would create a risk

3  of decreased California spotted owl survival and reproduction in

4  the project area, even if California spotted owl occupancy

5  remains stable, and would contribute to the need to eventually

6  list the owl under the Endangered Species Act.  Blakesley Decl.

7  ¶¶ 7-11; Bond Decl. ¶¶ 16-23, 38-39.

8       In addition, aside from the 6,440 acres Meadow Valley

9  Project itself, Plaintiff argue that there are an additional 14

10  PACs and associated HRCAs within the greater 85,919 acre wildlife

11  analysis area that may be indirectly adversely impacted, as well

12  as 15 more such areas just outside the analysis area.  According

13  to Plaintiffs, the EA has failed to adequately take these

14  considerations, and the cumulative impacts these pose, into

15  account.

16       The MVP EA states that the project alternative selected

17  (Alternative C) has a higher risk for adversely affecting the

18  California spotted owl because it deviates more significantly

19  from prior California spotted owl management strategy and does

20  create structurally unsuitable habitat across the project area by

21  reducing canopy closure and old forest conditions.  13 AR 4824.

22  Although the EA goes on to conclude that California spotted owl

23  population/occupancy in the greater wildlife analysis area is not

24  expected to diminish overall as a result of the project (12 AR

25  4438), Plaintiffs assert that this conclusion is conclusory and

26  lacks the quantified analysis to survive NEPA scrutiny.

27  According to Plaintiffs, the EA makes no more than "general

28  statements about possible effects and some risk" that are

-21-

1  insufficient to constitute the "hard look" required by NEPA.

2  <u>Klamath-Siskiyou Wildland Center v. Bureau of Land Mgmt.</u>, 387

3  F.3d 989, 993-94 (9th Cir. 2004).

4       Specifically, Plaintiffs maintain that the EA fails to

5  discuss several reasonably foreseeable future actions

6  implementing the QLG Act pilot project that had been proposed or

7  planned at the time the MVP was approved.  (Pl's Opening Brief,

8  26:5-7).  To that end, Plaintiffs maintain that the Empire,

9  Basin, Watdog and Slapjack projects were are well along in the

10 planning process when the MVP was approved, yet the EA fails to

11 consider those projects or evaluate their potential cumulative

12 effects in conjunction with the MVP.

13      Plaintiffs also take issue with the EA's conclusion that the

14 project-specific effects of the Forest Service's proposed actions

15 are not likely to be considered "highly controversial" (13 AR

16 4815), and hence do not require preparation of a full EIS.

17 Plaintiffs point to the declarations of their own scientists to

18 create the requisite controversy.  Additionally, in arguing that

19 the effects of the MVP are also "highly uncertain" and merit

20 preparation of an EIS on that basis as well (See 40 C.F.R. §

21 1508.27(b)(5)), Plaintiffs point to the Forest Service's own

22 previous findings as proof of such uncertainty.  They emphasize

23 that the MVP is the first major project to fully implement the

24 QLG-prescribed group selection and DFPZ treatments without

25 previously recognized California spotted owl habitat protections.

26      In countering Plaintiffs' argument that it failed to

27 adequately consider the cumulative effects of the project, the

28 Forest Service first argues that Plaintiffs' failure to

1   specifically raise the projects not considered by the Forest
2   Service precludes Plaintiffs from now raising those unexhausted
3   contentions.   The Forest Service points out that in order to
4   challenge an administrative decision in Federal court, a
5   plaintiff must first exhaust all available remedies required by
6   statute.   In that regard, the Forest Service contends that the
7   issues raised in an administrative appeal must be delineated in
8   sufficient detail to provide notice to the Forest Service to
9   rectify any alleged violations.   Native Ecosystems Council v.
10  Dombeck, 304 F.3d 886, 899 (9th Cir. 2002).   The Forest Service
11  maintains that Plaintiff failed to meet their exhaustion
12  requirement because they neglected to specifically raise the
13  Empire, Basin, Watdog and Slapjack projects now identified in
14  this lawsuit.

15      This argument fails for several reasons.   First, the
16  cumulative impacts issue arises in the context of Plaintiffs'
17  NEPA claims and neither NEPA itself, nor NEPA's implementing
18  regulations, contain an exhaustion requirement.   Consequently the
19  statutes in question do not mandate exhaustion.   See Darby v.
20  Cisneros, 509 U.S. 137, 146-47 (1993).   To the contrary, in
21  claims arising under NEPA, "the Forest Service has a duty to
22  address cumulative action regardless of whether plaintiffs
23  complain of violations."   Sierra Club v. Bosworth, 199 F. Supp.
24  2d 971, 988 (N.D. Cal. 2002); see also California v. Bergland,
25  483 F. Supp. 465, 472, n. 5 (E.D. Cal. 1980)(noting that "there
26  appear to be no administrative remedies to exhaust before suing
27  under NEPA").   Finally, as Plaintiffs point out, they
28  participated in the comment and administrative appeals process

1  for the MVP, and the record documents several instances where

2  Plaintiffs raised the Forest Service's alleged failure to

3  consider cumulative impacts in any event. (*See* Pls.' Opp'n to

4  Def.'s Mot. for Summ. J., pp. 15-17).

5       Plaintiffs' cumulative effect argument nonetheless fails to

6  pass muster when considered on its merits.  As the Forest Service

7  points out, although the MVP itself comprises only some 6,400

8  acres, in defining the wildlife analysis area for purposes of the

9  project EA, and in assessing cumulative effects, an area more

10 than twelve times as large was selected, based on the lines of

11 the next outlying HRCA beyond each HRCA where project activity

12 would occur.  *See* 12 AR 4489 (displaying relationship between

13 treatment zones, wildlife analysis areas and owl PACs and HRCAs);

14 *see also* 12 AR 4351 (defining the analysis area as "the project

15 area plus an additional larger land base, determined by spotted

16 owl distribution, that may be affected by cumulative effects,

17 totaling approximately 85,919 acres").  Significantly, defining

18 the geographic area for assessment purposes is "a task assigned

19 to the special competency of the appropriate agencies," and such

20 decisions are given deference.  Kleppe v. Sierra Club, 427 U.S.

21 390, 414 (1976); *see also* Selkirk Conservation Alliance v.

22 Forsgren, 336 F.3d 944, 959-960).

23      Forest Service formulation of the 85,919 acre wildlife

24 analysis area here is accordingly entitled to deference under

25 //

26 //

27 //

28 //

1  that standard.  All of the future projects[7] Plaintiffs claim

2  should have been analyzed are outside the cumulative effects

3  analysis area.  *See* Bednarski Decl., Attach. 1.  The Forest

4  Service is not obligated under NEPA to discuss how a proposed

5  project like the MVP would affect California spotted owl

6  population outside a reasonably selected wildlife analysis

7  boundary.  *See, e.g.,* Inland Empire Pub. Lands Council v. U.S.

8  Forest Serv., 88 F.3d 754, 757 (9th Cir. 1996).

9      While Plaintiffs rely on the Ninth Circuit's decision in

10  Klamath-Siskiyou, *supra*, that case dealt with future project

11  planned in the same watershed that had originally been conceived

12  as a single project.  387 F.3d at 992.  The present case is

13  distinguishable given the size of the analysis area as well as

14  the fact that said area was based on California spotted owl

15  distribution.  Consequently the Forest Service here appears to

16  have determined the boundaries of its analysis area with

17  cumulative effects in mind, as required by NEPA.  Selkirk, 336

18  F.3d at 958.

19      As indicated above, in addition to arguing that cumulative

20  effects have not been properly considered, Plaintiffs also

21  maintain that an EIS is warranted because the MVP failed to

22

23      [7]While Plaintiffs' cumulative effects argument appears to be
primarily centered on an alleged failure to properly consider
24  certain future projects falling outside the analysis area, with
respect to past and ongoing projects, the BA/BE for the MVP EA
25  identified numerous timber sale projects within the analysis
area, described the silvicultural system used, and the extent of
26  anticipated effects.  See 12 AR 4397-4402, 4434-4438, 4439.  The
number of acres treated or otherwise affected for some 14 past
27  and ongoing projects is listed, and the cumulative potential
reduction on spotted owl habitat is thereafter considered.  This
28  is sufficient for NEPA purposes.

consider the extent to which its proposed action would affect the
California spotted owl in other respects.  Plaintiffs
specifically contend that impacts on the California spotted owl
also "significantly affect" the environment because they are
"highly controversial" and because the risks entailed are
"uncertain or involve unique or unknown risks".  *See* 40 C.F.R. §
1508.27(b)(4), (5).[8]

Contrary to Plaintiffs' protestations, the MVP EA does take
a "hard look" at impacts to the California spotted owl and
concludes, as articulated by the Forest Service, that the impacts
would not be significant for six reasons.  First, as indicated
above, there would be no project activity in any PACs or SOHAs.[9]
*See* 13 AR 4824, 12 AR 4428.  Second, when analyzed throughout the

---

[8]The Court recognizes that the degree to which an action may
adversely affect an endangered or threatened species or its
habitat should also be considered, but merges that factor with
the highly controversial and uncertain aspects discussed below,
particularly given the fact that the California spotted owl is
not a listed species under the ESA.  Even if the owl were so
listed, however, the mere presence of a threatened or endangered
species in the project area does not necessarily mean that the
action would be significant as defined by Section 1508.27(b)(9).
*See* Southwest Ctr. for Biological Diversity v. U.S. Forest Serv.,
100 F.3d 1443, 1450 (9th Cir. 1996).  Finally, with respect to
the effect of the action on public health and safety pursuant to
Section 1508.27(b)(2), those considerations will be discussed
with respect to potential fire risks stemming from the project,
also discussed *infra*.

[9]Plaintiffs also argue that the Forest Service failed to
identify or assess a larger "biological home range" of the
California spotted owl, of which they maintain that the HRCAs
comprise only some 20 percent, with 30-40 percent of owl activity
occurring in the portion of the home range outside the HRCA.
(*See* Pl's Opp. to Defs.' Mot. for Summ. J., 19:13-15).  By
defining the wildlife analysis area at 85,919 acres, however, as
opposed to the 6,400 acres contained within the project itself,
the Forest Service allowed for the possibility that the
California spotted owl's actual home range exceeded HRCA size.

-26-

1  wildlife analysis area, the vast bulk of existing foraging
2  habitat (87 percent) and nesting habitat (95 percent) would be
3  retained.  13 AR 4824, *see also* 12 AR 4455.[10]  Third, "96% of the
4  combined acreage of PACs and HRCAs would not be treated."  13 AR
5  4824.  Fourth, of the 30 HRCAs situated within the wildlife
6  analysis area, sixteen would be reduced only by an average of 7
7  to 8 percent.  Id.  Fifth, the Forest Service found that the
8  three PAC/HRCAs subject to the greatest suitable habitat
9  reduction had not been occupied by owls for the preceding two
10 years.  13 AR 4824, *see also* 12 AR 4455.  Finally, as discussed
11 in more detail below, the fact that DFPZs are designed to reduce
12 the risk of a catastrophic crown fire will actually safeguard the
13 canopy cover critical to California spotted owl habitat.  *See* 13
14 AR 4824; 12 AR 4433, 4455.

15      Moreover, in concluding that the previous 1999 ROD
16 unnecessarily "took a worst case approach to estimating effects"
17 on California spotted owl habitat (by assuming that group
18 selection/DFPZ construction would render 100 percent of impacted
19 habitat unsuitable (*see* MRR 55; *see also* 4 AR 1402), the Forest
20 Service found that past fuel reductions in owl nesting habitat
21 "actually reduced that habitat by less that one percent of the
22 acreage treated," rather than 100 percent.  MRR at 55.  The team

23
24      [10]The Forest Service estimates that some 26,300 acres of
   foraging habitat would remain within the analysis area.  12 AR
25 4367-68.  This conclusion was reached through analysis of
   existing vegetative conditions, as determined by canopy closure
26 assessment through the California Wildlife Relationship ("CWHR")
   system, which assigns categories based on tree size and canopy
27 cover.  *See* 12 AR 4469.  The cumulative changes in CWHR types for
   each alternative contemplated by the MVP were considered.  See 12
28 AR 4390-92.  Hence Plaintiffs' assertion that the MVP fails to
   consider effects on owl foraging habitat appears misplaced.

-27-

reviewing the 199 ROD further explained:

> "Considering all timber strata used by owls for nesting, past projects reduced only six percent of the acres of habitat treated to lower quality habitat strata.  Even assuming the Pilot Project would double the highest percentage of reductions in habitat within treated areas previously experienced (six percent); the projected reductions in owl habitat would only be 12 percent of the 100 percent used in the analysis."

Id.

Examination of the MVP BE also indicates that project effects of fragmentation and loss of connectivity of California spotted owl habitat were considered.  Although recognizing that group selection would create some "low-moderate density openings within stands" (12 AR 4432), the Forest Service determined that the size of these gaps would still "meet the definition of continuous forest cover" previously formulated by California spotted owl habitat guidelines.  12 AR 4432, 4438; 15 AR 5465. The Forest Service biologist went on to conclude that this would not significantly impact the California spotted owl because the canopy openings would be low to moderate in extent, and because other structural elements like retained large trees, downed logs and snags would mitigate against habitat barriers.  *See* 12 AR 4432.  The Forest Service further noted that historical understory densities were discontinuous and that understory elements can return relatively quickly.  Id.[11]

In addition to analyzing impact on California spotted owl

---

[11]The Forest Service also evaluated effects on California spotted owl prey base, and determined that structural elements retained for owl habitat (like snag retention and downed logs) would also provide habitat for species preyed on by the California spotted owl like woodrats and flying squirrels.  *See* 12 AR 4434.

habitat, the EA defends its conclusion that California spotted

owl occupancy would not be reduced with scientific support also

providing a reasonable basis for the Forest Service to have

concluded that potential effects to California spotted owls would

not be significant.  A Forest Service biologist examined 16 HRCAs

which would be directly affected by the MVP (*see* 12 AR 4431), and

for each such HRCA analyzed the likelihood of occupancy based on

past data on reproduction and pair occupancy in the associated

PAC. *See* 12 AR 4475.  The biologist further assessed the

percentage portion of the HRCAs subject to treatment along with

the number of acres of suitable habitat to be harvested.  Based

on those figures, the degree of potential risk to PAC viability

was calculated and considered.  12 AR 4427-4440.

     In determining that the degree and distribution of habitat

impacts would not lead to changes in California spotted owl

occupancy or threaten the species' viability (*see* 15 AR 5467),

the Forest Service relied in part on similar silvicultural and

fuel treatments, as well as other improvements, that have been

implemented on the Mount Hough Ranger District in recent years.

13 AR 4816.

     The mere existence of opposition to a project does not

automatically render it controversial; it is only one factor to

be considered in whether an EIS must be prepared.  Greenpeace

Action v. Franklin, 14 F.3d 1324, 1333 (9th Cir. 1992; Cold

Mountain v. Garber, 375 F.3d 884, 893 (9th Cir. 2004).  While

Plaintiffs asserted during oral argument that anything impacting

California spotted owl habitat is by its very nature

controversial, that position is unfounded.  Instead, a

1  substantial question as to significant environmental degradation
2  is required in order to cast serious doubt as to the
3  reasonableness of an agency's determination.  Nat'l Parks v.
4  Babbitt, 241 F.3d at 736.  Plaintiffs have not identified
5  concerns rising to that level in this case.

6      Similarly, in concluding that project risks to the
7  California spotted owl are neither uncertain nor unknown, as
8  indicated above the Forest Service addressed direct effects to
9  California spotted owl habitat on sixteen PACs/HRCAs, the
10 indirect effect of the project on thirty others, and the extent
11 to which suitable habitat within each HRCA was impacted. 12 AR
12 4427-4432; see also 15 AR 5462.  The Forest Service also pointed
13 to its experience with similar projects in concluding that
14 anticipated project effects were not unknown.  13 AR 4816.  In
15 addition, and in any event, "NEPA regulations do not require a
16 reviewing agency to eliminate all uncertainty prior to issuing a
17 [finding of no significant impact]."  Northwest Envtl. Def. Ctr.
18 v. Wood, 947 F. Supp. 1371, 1385 (D. Or. 1996)

19     Taken as a whole, the EA and supporting documents adequately
20 evaluated the potential impact to the California spotted owl
21 posed by the MVP, and reasonably concluded that no significant
22 effects would result.  Invalidating the scientific analysis
23 undertaken by the Forest Service in the EA would force this Court
24 to choose between competing expert opinions, a position it should
25 avoid.  See Greenpeace Action v. Franklin, 14 F.3d 1324, 1333 (9th
26 Cir. 1992).  In addition, the fact that Plaintiffs have produced
27 scientists disagreeing with the agency's conclusions does not
28 render the agency's conclusions invalid.  See City of Carmel-by-

-30-

1  the-Sea v. U.S. Dep't of Transp., 123 F.3d 1142, 1151-52 (9th Cir.

2  1997) ("When specialists express conflicting views, an agency

3  must have discretion to rely on the reasonable opinions of its

4  own qualified experts even if, as an original matter, a court

5  might find contrary views more persuasive.").

6      In reviewing the Forest Service's decision not to prepare an

7  EIS in this case, this Court will only assess whether its

8  decision is "based on a 'reasoned evaluation of the relevant

9  factors.'"  Nat'l Envtl. Def. Ctr. v. Bonneville Power Admin.,

10  117 F.3d 1520, 1536 (9th Cir. 1997).  The Court concludes that

11  such a reasoned evaluation occurred here with respect to

12  potential impacts of the MVP on the California spotted owl.

13  Consequently no EIS is mandated, and the Forest Service is

14  entitled to judgment as a matter of law.

15

16  B.  Potential Fire Risk/Resilience Associated with Project

17  Activity

18      Plaintiffs also claim that the fuel treatment anticipated by

19  the MVP "will *increase* the potential for, and risk of, severe

20  fire in the project area."  Pls' Mem. At 10.  In support of their

21  argument in that regard Plaintiffs allege that slash, or

22  flammable logging debris, will be left on site.  Plaintiffs

23  further contend that opening the forest canopy through

24  construction of group selection units will facilitate the growth

25  of highly flammable underbrush and will result in drier

26  conditions more conducive to fire.  In arguing that these factors

27  also require preparation of an EIS, Plaintiffs contend that the

28  project affects "public health and safety".  40 C.F.R. §

-31-

1508.27(b)(2).  Plaintiffs further assert that the MVP runs

counter to the stated objective of the QLG Act in decreasing fire

risk and achieving fire resilient forests.

These concerns appear unfounded.  Initially, it should be
noted that a key objective of the project is to reduce the risk
of the Meadow Valley community to lightning-induced fires,
several of which have threatened the community since 1999.  The
contemplated group selection units, in providing a fuel break,
are designed to slow the advance of fire igniting in or near
those units.  *See* 15 AR 5480-81.[12]  In addition, the MVP DFPZs are
intended as part of a larger strategic system of DFPZs that
provide safer locations from which firefighters may operate in
the event of wildfire.  13 AR 4743.  The DFPZs, as designed, also
serve to reduce the possibility of a catastrophic crown fire that
would remove forest cover and, consequently, California spotted
owl habitat.  13 AR 4824.[13]

The QLG Act is also designed to increase long-term fire
resilience by promoting development of an all-age, multistory
forest more akin to Sierra Nevada forests that existed prior to
European settlement and twentieth century forest management.  *See*

---

[12]As the Record also indicates, some group selection units
may slow the initial spread of a fire, ignited inside or
immediately adjacent to such units, from its point of origin,
giving firefighters more time to implement effective suppression
action.  13 AR 4869; *see also* 13 AR 4795.

[13]Although Plaintiffs argue that a small portion of acreage
selected for group selection units (108 acres) and DFPZs (84
acres) had already been treated for fuel reductions, the
Declarations of James M. Peña and Carl Skinner proffered by the
Forest Service adequately explain why retreatment of these
relatively small areas was indicated.  *See* Peña Decl., ¶¶ 17-22;
Skinner Decl., ¶ 19.

QLG Act § 401(d)(2).  By opening the canopy and facilitating

grown of more shade-intolerant (and fire resistant) pine trees,

overall fire resilience is improved.[14]  *See* Skinner Decl. ¶¶ 6-7,

10-11.  The EA adequately evaluated the potential effects of the

MVP on fire and fuels and reasonably concluded that an EIS was

not required.  *See* 13 AR 4795 (discussing effects of group

selection on fire and fuels); 13 AR 4864-4887 (Fire/Fuels

Report).

With respect to Plaintiffs' specific arguments concerning

fire risk, the MVP does require treatment of logging slash,

contrary to Plaintiffs' assertion.  The timber contracts that

will be used to implement the project will contain provisions

requiring that slash be remediated.  *See, e.g.,* 16 AR 5781, 5935

(Provision B6.7); 16 AR 5821-23, 5977-79 (Provision C6.7).  As

explained in response to comments generated by the EA:

> "[A]fter tree removal in group selection units, activity-
> created fuels in the unit would be treated by one or more of
> the following methods: piling and burning, underburning,
> mastication, or by no treatment at all where residual
> surface fuels are at an acceptable level.  Trees from group
> selection units would be yarded whole to landings.  Excessive
> surface fuels on landings not chipped and removed as biomass
> would be treated with prescribed fire.  Excessive surface
> fuels created in group selection units would not go
> untreated."

15 AR 5480; *see also* 13 AR 4794 ("[r]esidue from group selection

---

[14]Although Plaintiffs also argue the Forest Service's
promotion of pine growth is not recommended for higher elevation
forests and contend that group selection is consequently not
indicated on that basis, as the Forest Service points out, the
overwhelming majority of group units are located below 5500 feet,
and the vast majority of groups located above 5500 feet are
located on south facing exposures, which are hotter and drier,
and therefore more able to support ponderosa pine.  *See* Forest
Service Reply Mem., 39:8-11).

and DFPZ construction would be burned, so that surface fuels would be decreased.").[15]  With respect to timing of these treatments, the timber contracts require a schedule for completion of slash treatment prior to commencement of logging operations.  16 AR 5821.  Burn piles within group selection units are anticipated to be burned with one year.  15 AR 5470.  Consequently, Plaintiffs' assertion that slash will remain untreated indefinitely is not supported by the record.

Plaintiffs also argue that whole tree yarding, pursuant to which trees are cut into pieces and then removed intact, is only required for smaller trees less than 20 inches in diameter, while larger trees generating more slash may be shorn of limbs before being cut into pieces and skidded to landings.  *See* 16 AR 5817.  In making that argument, Plaintiffs contend that the term "bucked" means that log branches are removed.  The Forest Service, however, in response, points out that the term "bucking" actually refers to sawing felled trees into shorter lengths, as opposed to "limbing" which entails branch or limb removal.  In fact, the project requires that all trees be whole yarded, and only the butt log sections of trees greater than 20 inches in diameter can be limbed.  Because the "butt log" is defined[16] as

---

[15]Although Plaintiffs assert that slash will be treated in the great majority of the project area by simply scattering it to as much as an 18 inch depth in given logging units (*see* Pls.' Opp. To Defs.' Mot. for Summ. J., 6:2-3), such scattering appears to be contemplated only for treatment along roads and in DFPZ units prior to underburning, and is not planned for group selection units.  *See* Forest Service's Reply Mem., 35:15-18).

[16]Pertinent forestry terms, including both "butt log" and "bucking", are defined in Fed. Defs.' Ex. E.

1   "the first log cut above the stump", and because the lower

2   portions of larger trees typically have few if any branches, the

3   Forest Service maintains that little slash debris would result.

4   That conclusion makes sense.

5       With respect to Plaintiffs' assertion that flammable

6   vegetation will rapidly regrow in treated areas, thereby

7   increasing fire risk, the Forest Service notes that brush growth

8   is not highly flammable until after 20-30 years of brush growth,

9   and points out that overstory tree growth will occur in the

10  treated areas prior to that time.  15 AR 5480.

11      Finally, Plaintiffs also pose the general argument that

12  construction of DFPZs and group selection units, as envisioned by

13  the MVP, will create hot and dry conditions that facilitate fire.

14  *See* Decl. of Dennis Odion, ¶¶ 13-14.  As indicated above,

15  however, the the EA outlines why the Forest Service concluded

16  that the project does have beneficial effects in terms of

17  decreasing fire risk and promoting fire resilience.  In addition,

18  Plaintiffs have no demonstrated that slash residue poses an

19  unacceptable risk triggering the need for an EIS.

20      The fire risk/resilience portion of the MVP passes muster

21  under both NEPA and the QLG Act.  While Plaintiffs' experts

22  disagree, the Forest Service's informed judgment in this case is

23  entitled to deference.  Marsh v. Or. Natural Res. Council, 490

24  U.S. 360, 378 (1989) ("Because analysis of the relevant documents

25  'requires a high level of expertise,' we must defer to the

26  'informed discretion of the responsible federal agencies.'")

27  (*quoting* Kleppe, 427 U.S. at 412).  Consequently the Forest

28  Service is entitled to judgment as a matter of law as to the fire

1  risk/resilience issues as well, in that an EIS is not required

2  under the circumstances and that no QLG Act violation has

3  occurred.

4

5  C.  Designation, Rather than Individual Marking, of Trees to be
   Cut

6

7       In addition to the claimed NEPA violations outlined above,

8  Plaintiffs also contend that the MVP violates the NFMA by failing

9  to mark the trees to be removed in proposed group selection

10 units.  According to Plaintiffs, the designation of trees to be

11 logged by description is inadequate to meet the requirements of

12 the NFMA.

13      Section 472a(g) of the NFMA provides in pertinent part as

14 follows:

15      "[d]esignation, marking when necessary, and supervision of
        harvesting of trees, portions of trees shall be conducted by
16      persons employed by the Secretary of Agriculture.  Such
        persons shall have no personal interest in the purchase or
17      harvest of such products and shall not be directly or
        indirectly in the employment of the purchase thereof."

18      Despite the fact that the language of the statute itself

19 indicates that marking is only required "when necessary",

20 Plaintiffs assert that designation is appropriate only when all

21 trees in a given area are either to be removed or retained.[17]

22 They argue that because the MVP calls for a mix of trees to be

23 removed or retained in the group selection units, the Forest

24

25      [17]Plaintiffs cite legislative history for Section 472a(g) to
   the effect that the Secretary of Agriculture should have
26 "sufficient flexibility" to indicate timber to be harvested "by
   designating an area in which all timber will be cut, where trees
27 to be cut will be marked, or where trees to be left will be
   marked."  S. Rep. No. 94-893 at 21.22 (1976), *reprinted in* 1976
28 U.S.C.C.A.N. 6662, 6681.

1  Service is obligated by statute to individually mark the trees
2  slated for removal.

3      Individual marking is not necessary in this case because the
4  timber contracts in question unequivocally designate the size of
5  trees which may be removed.  *See, e.g.,* 16 AR 5793, 5948
6  (specifying that "no tree larger that 29.9 inches in diameter at
7  breast height (DBH) is designated for cutting under this
8  contract...").  Because such provisions unambiguously "designate"
9  the size of trees to be cut, there is no room for discretion on
10 the part of the timber purchaser.  There is no violation of the
11 NFMA in the designation provided for within the MVP.

12

13 C.  Availability of Injunctive Relief

14

15      Plaintiffs, in seeking declaratory judgment that the MVP
16 cannot proceed without first preparing an EIS, in essence seek
17 injunctive relief to prevent the project from going forward on
18 the basis of the EA, alone.  Plaintiffs contend that if the MVP
19 projects proceeds in violation of the procedural mandates of
20 NEPA, as well as the substantive requirements of the QLG Act and
21 the NFMA, irreparable environmental harm will occur both because
22 of potential impacts to the California spotted owl, and because
23 of an increased risk of severe wildfire in the project area.

24      The standard governing issuance of such a permanent
25 injunction must therefore be considered.  A two-part inquiry is
26 required in that regard.  Amoco Production v. Village of Gambell,
27 Alaska, 480 U.S. 531, 542 (1987).  First, a court must determine
28 whether any statute restricts its traditional equity

                              -37-

1  jurisdiction.  If no such restriction is present, a traditional
2  balancing of equities must ensue to determine whether an
3  injunction is appropriate.  Id.

4       Turning first to the initial area of inquiry, the Ninth
5  Circuit has held that "[t]here is nothing in NEPA to indicate
6  that Congress intended to limit [a] court's equitable
7  jurisdiction." Save the Yaak, 840 F.2d at 722, *citing* Northern
8  Cheyenne Tribe v. Hodel, 842 F.2d 224, 230 (9th Cir. 1988).
9  Morever, while not directly addressed in the context of the NFMA
10 and QLG Act, courts in this circuit have also assumed that
11 injunctive relief for such violations is appropriate, and the
12 parties herein do not dispute the potential availability of such
13 a remedy. *See, e.g.,* Idaho Sporting Congress, Inc., v.
14 Rittenhouse, 305 F.3d 957, 976 (9th Cir. 2002)(NFMA); Neighbors of
15 Cuddy Mountain v. United States Forest Service, 137 F.3d 1372,
16 1382 (9th Cir. 1998)(NFMA).  Consequently this Court must proceed
17 to the second prong of the analysis and balance the equities
18 involved by considering "irreparable injury and inadequacy of
19 legal remedies." Amoco Production, 480 U.S. at 542.

20      The Supreme Court, in Amoco Production, emphasizes that in
21 environmental cases, the balance of harms typically weighs in
22 favor of issuing an injunction: "Environmental injury, by its
23 nature, can seldom be adequately remedied by money damages and is
24 often permanent or at least of long duration, i.e., irreparable.
25 If such injury is *sufficiently likely*, therefore, the balance of
26 harms will usually favor the issuance of an injunction to protect
27 the environment." Id. at 545, emphasis added.  Nevertheless there
28 can be no presumption of environmental harm from alleged

-38-

1 violations of an environmental statute.  *See* <u>id</u>. at 542; <u>Sierra</u>
2 <u>Club v. Penfold</u>, 857 F.2d 1318 (9th Cir. 1988).

3       The necessary assessment of whether environmental injury is
4 "sufficiently likely" in order to warrant an injunction brings to
5 play the same factors already discussed.  This Court has
6 determined above that the MVP poses no significant effect on the
7 environment either in terms of its impact to the California
8 spotted owl, or with respect to increased fire risk.   The Court
9 has granted summary judgment in favor of the Forest Service as to
10 those issues, which are the very same bases proffered by
11 Plaintiffs as justification for injunctive relief in this case.
12 Consequently, for the reasons previously stated, no "sufficiently
13 likely" environmental injury has been identified here that would
14 warrant issuance of a permanent injunction prohibiting the MVP
15 from going forward in the absence of an EIS.  Without the
16 possibility of likely environmental injury, Plaintiffs cannot show
17 the requisite irreparable harm.  Moreover, because Plaintiffs have
18 not shown such likelihood, the Court need not engage in a
19 balancing of harms analysis.  *See* <u>Idaho Sporting Congress, Inc. v.</u>
20 <u>Alexander</u>, 222 F.3d 562, 569 (9th Cir. 2000).

21

22                              **CONCLUSION**

23

24       For all the foregoing reasons, summary judgment in favor of
25 the Forest Service is granted.  The record demonstrates that the
26 EA prepared in this matter was based on a reasoned evaluation of
27 relevant factors.  Consequently, the "hard look" already taken by
28 the Forest Service through the EA is sufficient, and no EIS is

                              -39-

1   required.   The fact that Plaintiffs' experts may agree with the

2   conclusions reached is immaterial given the fact that the Forest

3   Service may rely upon its own expert analysis in thoroughly

4   considering the project.   Further, in the absence of demonstrating

5   that environmental injury in this case is sufficiently likely,

6   Plaintiffs have also no established entitlement to the permanent

7   injunctive relief they seek in prohibiting implementation of the

8   MVP pending preparation of an EIS.

9        IT IS SO ORDERED.

10  DATED: May 6, 2005

11                         _____
                           MORRISON C. ENGLAND, JR.
12                         UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28