1

2

3

4

5

6

7

8                         UNITED STATES DISTRICT COURT

9                         EASTERN DISTRICT OF CALIFORNIA

10

                                ----oo0oo----

11

12  SIERRA NEVADA FOREST
    PROTECTION CAMPAIGN, PLUMAS
13  FOREST PROJECT EARTH ISLAND
    INSTITUTE; and CENTER FOR
14  BIOLOGICAL DIVERSITY, non-
    profit organizations,
15                                       NO. CIV. S 04-2023 MCE GGH

16              Plaintiffs,

17      v.                               AMENDED MEMORANDUM AND ORDER

18  UNITED STATES FOREST SERVICE;
    JACK BLACKWELL, in his
19  official capacity as Regional
    Forester, Region 5, United
20  States Forest Service; and
    JAMES M. PEÑA,

21              Federal Defendants,

22      and

23  QUINCY LIBRARY GROUP,
    an unincorporated citizens
24  group; and PLUMAS COUNTY,

25              Defendant-Intervenors.

26

27                              ----oo0oo----

28

                                     1

1

2

3    In instituting this litigation, Plaintiffs Sierra Nevada

4  Forest Protection Campaign, Plumas Forest Project Earth Island

5  Institute, and Center for Biological Diversity (hereinafter

6  collectively referred to as "Plaintiffs") challenge the decision

7  by Defendants United States Forest Service, Jack Blackwell, and

8  James Peña (hereinafter "Forest Service") to proceed with

9  implementation of the logging and fuel treatments contemplated by

10 the Meadow Valley Project ("MVP").  Specifically, Plaintiffs

11 assert that the Forest Service's approval of the project without

12 preparation of an Environmental Impact Statement ("EIS") violated

13 the provisions of the National Environmental Protection Act, 42

14 U.S.C. § 4321, et seq. ("NEPA").  Plaintiffs further assert that

15 the project, as designed, fails to achieve fire resilient forests

16 despite being contemplated to do so.  Finally, Plaintiffs contend

17 the Forest Service failed to specifically mark trees for removal

18 pursuant to the MVP in violation of the National Forest

19 Management Act, 16 U.S.C. § 472a(g). ("NFMA").

20    Plaintiffs now move for summary judgment on grounds that the

21 administrative record establishes, as a matter of law, that an

22 EIS should have been prepared, that the project was be redesigned

23 to achieve fire resilience, and that the Forest Service must mark

24 all trees as required by the NFMA.  The Forest Service has

25 responded with its own motion for summary judgment.  The Forest

26 Service argues that the MVP in fact meets all federal

27 requirements and that an EIS is consequently unnecessary.

28    For the reasons stated below, summary judgment in favor of

1  the Forest Service will be granted, and Plaintiffs' motion will
2  be denied.[1]

3
4                         **FACTUAL BACKGROUND**
5
6      This case arises from the Herger-Feinstein Quincy Library
7  Group Forest Recovery Act of 1998 ("QLG Act" or "Act"), pursuant
8  to which Congress directed the Secretary of Agriculture to
9  conduct a pilot project involving construction of a strategic
10 system of defensible fuel profile zones ("DFPZs") and group
11 selection logging designed "to achieve a desired future condition
12 of all-age, multistory, fire resilient forests."  QLG Act, Pub L.
13 105-277, Div. A. [Title IV, Sec. 401], Oct. 21, 1998, 122 Stat.
14 2681-305 (16 U.S.C. § 2104 note), § 401(b), (d).  Pursuant to the
15 QLG Act, a pilot project area is to be implemented on
16 approximately 1.5 million acres within the Plumas and Lassen
17 National Forests and the Sierraville Ranger District of the Tahoe
18 National Forest.
19     In implementing the QLG Act, Congress exempted the habitat
20 of the California spotted owl.  The California spotted owl is a
21 medium sized raptor inhabiting the Sierra Nevada mountain range
22 from Shasta County south to Kern County.  The California spotted
23 owl has not been classified as either threatened or endangered
24 under the Endangered Species Act of 1973 ("ESA").  *See* 68 Fed

25  ────────────────
26      [1]This Amended Memorandum and Order supersedes the Memorandum
   and Order filed May 9, 2005 in this matter.  The modifications
27 contained in this amended version, which expand upon
   considerations of equitable balancing in the context of
   Plaintiffs' request for injunctive relief, do not change the
28 substance of the Court's original order.

Reg. 7580, 7608 (Feb. 14, 2003) (denying petition to list the owl).  The California spotted owl has, however been designated as a "sensitive" species due to concerns regarding its viability (13 AR[2] 4822) as the old forest conditions it prefers (typified by large trees, dense and multi-layered forest canopies, large standing dead trees ("snags") and downed logs and woody debris) have been depleted through logging, development and related activities.  *See* 10 AR 03838.[3]  Because its population changes are believed to indicate the effects of forest management practices on other species dependent on old forest habitat, the California spotted owl has also been designated as a "management indicator species" for the Plumas National Forest.  13 AR 4798-99.

In a 1999 Final Environmental Impact Statement ("FEIS") for the QLG Act pilot project on a programmatic basis, the Forest Service concluded that the construction of fuel treatments as envisioned by the Act would reduce the amount of California spotted owl nesting habitat by 7 percent and the amount of owl foraging habitat by an additional 8.5 percent, for a total reduction of 15.5 percent of suitable owl habitat within the pilot project area.  7 AR 2581.

In the Record of Decision ("ROD") that accompanied the 1999

---

[2]Designations to the "AR" throughout this Memorandum and Order refer to the Administrative Record designated by the parties.

[3]Nonetheless, within the approximately 7.37 million acres of forested land within the Sierra Nevada, some 4.12 million acres is considered potentially suitable habitat for the spotted owl. 4 AR 1402.

-4-

1  FEIS, the Forest Service recognized that a 15.5 percent reduction
2  in California spotted owl habitat "could pose a serious risk to
3  the viability of the California spotted owl in the planning area,
4  thereby making the implementation of [the selected alternative]
5  inconsistent with the National Forest Management Act."  7 AR
6  2384.  The Forest Service concluded that "additional mitigation
7  must be applied... in order to provide sufficient protection to
8  the California spotted owl." 7 AR 2388.  Consequently, as a
9  mitigation measure, the Forest Service required that "[a]t the
10 site-specific level, defensible fuel profile zones, group
11 selection harvest areas, and individual tree selection harvest
12 areas will be designed and implemented to completely avoid
13 suitable California spotted owl habitat, including nesting
14 habitat and foraging habitat."  7 AR 2383.  The 1999 ROD provided
15 only programmatic direction in this regard, and specified that
16 all project-level decisions must be implemented "after site-
17 specific environmental analysis and review."  Id.

18      In 2001, the Sierra Nevada Forest Plan, which provides a
19 comprehensive management strategy for all eleven national forests
20 within the Sierra Nevada range, was amended.  In addressing the
21 maintenance of old forest ecosystems and species associated with
22 those ecosystems, the ROD adopting the amendment imposed
23 requirements for managing the California spotted owl.  The ROD
24 established Protected Activity Centers ("PACs"), which consisted
25 of 300 acres around each known owl nest or roosting site.  In
26 addition, 1,000 acre Home Range Core Areas ("HRCAs") were set
27 aside in conjunction with each PAC.  The 2001 ROD imposed
28 additional requirements on timber harvest, including diameter

-5-

1   limits and requirements for snag retention and forest canopy
2   closure.

3       Following adoption of the 2001 Sierra Nevada Forest Plan
4   Amendment ("2001 SNFPA"), the Forest Service determined that
5   additional review was needed to determine how to implement the
6   QLG pilot project to the fullest extent possible.  The year-long
7   public review which ensued culminated with the issuance of new
8   management recommendations in March of 2003.  The resulting SNFPA
9   Management Review and Recommendations ("MRR")[4] determined that
10  the 2001 ROD "severely limits" implementation of the QLG project
11  by precluding DFPZs and group selection areas.  *See* MRR at 6.
12  The review further determined that a new California spotted owl
13  analysis was warranted, and concluded that studies leading to the
14  2001 ROD unnecessarily "took a worst case approach to estimating
15  effects" on the California spotted owl.  MRR at 55.  In
16  particular, the 2003 review found that fuel reduction thinnings
17  entailed by DFPZ construction in owl nesting habitat actually
18  reduced that habitat by less than one percent in treated acreage,
19  as opposed to the 100 percent impact assumed by prior analysis.
20  Id.  Consequently the prior assessment was determined to be
21  unduly conservative.  *See* id.

22      Following receipt of the aforementioned MRR, an additional
23  programmatic Environmental Impact Statement was prepared.  The
24  ensuing 2004 ROD, which replaced the 2001 ROD in its entirety,
25  amended the Sierra Nevada Forest plans. ("2004 SNFPA").  The 2004
26

27      [4]A complete copy of the MRR is attached to the Forest
    Service's Second Errata to Memorandum in Support of Cross Motion
28  for Summary Judgment.

SNFPA revised the analysis of likely effects to the California
spotted owl, and allowed for full implementation of the QLG Act.
*See* 4 AR at 1055-56.   Nonetheless, under the terms of the 2004
SNFPA, site-specific projects must still be scrutinized for their
particular environmental impact, if any.

The Meadow Valley project at issue in this litigation
("MVP") is one such site-specific project.   The MVP, approved by
the Forest Supervisor for the Plumas National Forest on April 16,
2004, is part of the QLG pilot project and involves logging of
about 40 million board feet of timber from approximately 6,440
acres in a 50,400 acre area over a five-year period.   The MVP is
located within the Mount Hough Ranger District, Plumas National
Forest, and is located approximately five miles west of Quincy,
California.   The project surrounds the community of Meadow
Valley.

The group selection aspect of the MVP involves 743 acres in
488 units scattered throughout the project area.   13 AR 4760.
The contemplated group selection units range in size from one-
half to two acres, and entails removal of trees up to 30 inches
in diameter at breast height ("dbh"). 12 AR 4346, 4350.   Although
this logging would significantly reduce forest canopy cover in
the areas involved, the Forest Service maintains that the broad
dispersal of the units themselves would still maintain relatively
continuous forest cover within the stand as a whole, and would
therefore ensure habitat connectivity for wildlife species
dependent on old forest conditions.   At the same time, according
to the Forest Service, opening the forest canopy in the group
selection units permits the reforestation of shade-intolerant

-7-

species like the ponderosa pine and hence contributes to forest diversity and the recreation of pre- European settlement conditions.

In addition to the group selection areas, the MVP also calls for approximately 5,700 acres of DFPZ logging in 37 units.  13 AR 4760-63.  DFPZs are long strips, up to a quarter mile in width, that generally follow ridgetops or roadway areas.  DFPZs are designed to provide breaks that reduce the possibility of catastrophic crown fire destroying the forest canopy.  *See* 13 AR 4824; 12 AR 4433-4455.   Within DFPZ units, trees larger than 20" dbh would be retained in approximately 82 percent of the units, and trees larger than 30" would generally be retained in all units, along with snags and large logs.  13 AR 4793; 15 AR 5498.  No minimum canopy cover is required in DFPZs unless the area slated for treatment had more the 40 percent canopy cover beforehand, in which case that cover would be retained.  That cover requirement, however, applies to only some 978 acres of the total 5,700 acres contemplated as DFPZs.  *See* 15 AR 5498.

For both group selection and DFPZ units, the MVP calls for treatment of activity-related fuels (slash) through either piling and burning, underburning or mastication of this logging-related debris so as to ensure acceptable levels of residual fuel loading.  *See* 15 AR 5480, 13 AR 4884.  Completion of the group selection and DFPZ units, including slash treatment, is contemplated to occur within five years after project contracts are awarded.  *See* 13 AR 4764.   With regard to group selection units, the trees to be logged are designated by description, as opposed to individual marking of specified trees.  16 AR 5754.

-8-

1    According to the Forest Service, implementation of the MVP

2  meets the objectives of the QLG Act by achieving an all-aged

3  mosaic of timber stands that contributes to the local economy

4  through a sustainable output of forest products, and at the same

5  time comprises a fuel treatment network necessary to reduce the

6  potential risk of future wildfires, provide for increased

7  firefighter safety, and protect the community of Meadow Valley in

8  the event of a wildfire.[5]  13 AR 4771-72.

9    With respect to California spotted owl habitat, no MVP

10  activity is contemplated in either PACs or Spotted Owl Habitat

11  Areas ("SOHAs").  13 AR 4824.  SOHAs are defined as designated

12  stands of owl habitat, comprising at least 1,000 acres, that are

13  located within a 1.5 mile radius of a nesting site.  Consequently

14  SOHAs are less inclusive than HRCAs, which by definition

15  encompass 1,000 acres immediately around the 300 acre PAC stands

16  surrounding a California spotted owl nesting or roosting site.

17  Using these strictures, the project EA determined that some 96

18  percent of the combined acreage of PACs and HRCAs within the

19  wildlife analysis area (85,919 acres) would not be treated.  Id.

20    The actual MVP area itself, however, contains some 945 acres

21  of suitable California spotted owl nesting habitat and 3,336

22  acres of suitable foraging habitat.  12 AR 4367-68.  Those 4,281

23  acres of suitable owl habitat comprise some 67 percent of the

24  project area's 6400 acres, but only 9.6 percent of total suitable

25

26    [5]In 1999 and 2000, four fires occurred in the vicinity of
Meadow Valley.  Two of those fires, the so-called Pidgeon and
27  Lookout Fires, entered the area contemplated for treatment under
the MVP and threatened the community of Meadow Valley.  See
28  Intervenors' Response to Pls.' Mot. for Summ J., pp. 5-6

-9-

1  habitat within the wildlife analysis area as a whole.  12 AR

2  4367.   The proposed MVP project would log portions of some 16

3  HRCAs.  12 AR 4428.   The Forest Service has acknowledged that MVP

4  logging may render unsuitable nearly all 4,281 acres of nesting

5  (94.6 percent) and foraging (86.6 percent) habitat in the project

6  area.  12 AR 4439-40.   Nonetheless, the Biological

7  Assessment/Biological Evaluation for the MVP ("BA/BE") concluded

8  that owl occupancy is not expected to diminish within the

9  wildlife analysis area as a whole and a cumulative population

10 loss is not anticipated with implementation of the MVP.  12 AR

11 4438.

12      After considering an environmental assessment ("EA") of the

13 project, the adoption of Alternative C (which allowed the most

14 logging/fuel treatment in the project area) was approved.   15 AR

15 5493.  Because the Forest Service concluded that the action being

16 proposed would not result in significant environmental effects, a

17 Finding of No Significant Impact ("FONSI") was issued and no EIS

18 was required.   Plaintiffs now challenge that decision by way of

19 this lawsuit,[6] and ask that a full EIS be prepared before the

20 project is commenced.

21      Specifically, Plaintiffs take issue with the Forest

22 Service's description of the project as achieving fire resilient

23 forest, claiming that to the contrary the risk of severe fire is

24 actually increased by the activity being contemplated.  In

25 addition, Plaintiffs claim that the proposed actions will also

26 _____

27      [6]It is undisputed that Plaintiffs filed timely
   administrative appeals of the Forest Service decision prior to
   commencement of this action (15 AR 6564-60, 5681-708) and that
28 those appeals were subsequently denied.  15 AR 5739-52.

1  adversely affect California spotted owl viability.  Moreover,
2  Plaintiffs assert that Plaintiffs have failed to adequately
3  disclose and consider the cumulative impacts of the project when
4  considered together with other past, present, and planned timber
5  sales in the project area.
6      As indicated above, Plaintiffs contend that these
7  shortcomings all run afoul of NEPA, and go on to identify an NFMA
8  violation on grounds that timber cutting by designation, as
9  contemplated by the MVP, is not permitted and that individual
10 marking, by Forest Service employees, of trees to be logged, must
11 instead occur.
12
13                    **PROCEDURAL FRAMEWORK**
14
15      Congress enacted NEPA in 1969 to protect the environment by
16 requiring certain procedural safeguards before an agency takes
17 action affecting the environment.  The NEPA process is designed
18 to "ensure that the agency ... will have detailed information
19 concerning significant environmental impacts; it also guarantees
20 that the relevant information will be made available to the
21 larger [public] audience."  <u>Blue Mountains Biodiversity Project</u>
22 <u>v. Blackwood</u>, 171 F.3d 1208, 121 (9th Cir. 1998).  The purpose of
23 NEPA is to "ensure a process, not to ensure any result."  <u>Id</u>.
24 "NEPA emphasizes the importance of coherent and comprehensive up-
25 front environmental analysis to ensure informed decision-making
26 to the end that the agency will not act on incomplete
27 information, only to regret its decision after is it too late to
28 correct."  <u>Center for Biological Diversity v. United States</u>

                              -11-

1  Forest Service, 349 F.3d 1157, 1166 (9th Cir. 2003).

2      NEPA requires that all federal agencies, including the

3  Forest Service, prepare a "detailed statement" that discusses the

4  environmental ramifications, and alternatives, to all "major

5  Federal Actions significantly affecting the quality of the human

6  environment."  42 U.S.C. § 4332(2)[C].  To determine whether this

7  detailed statement (commonly referred to as an EIS) is required,

8  an agency may first prepare an environmental assessment ("EA").

9  The objective of an EA is to "[b]riefly provide sufficient

10  evidence and analysis to determining whether to prepare" an EIS.

11  40 C.F.R. § 1508.9(a)(1).  If the EA indicates that the federal

12  action may significantly affect the quality of the human

13  environment, the agency must prepare an EIS.  40 C.F.R. § 1501.4;

14  42 U.S.C. § 4332(2)[C].

15      In the event an agency determines that an EIS is not

16  required, it must, as the Forest Service did here, issue a FONSI

17  detailing why the action "will not have a significant effect on

18  the human environment."  40 C.F.R. § 1508.13.  As is customary,

19  the FONSI in this case is contained within the project EA.  The

20  EA must support the agency's position that a FONSI is indicated.

21  Blue Mountains, 161 F.3d as 1214.

22      Whether there may be a significant effect on the human

23  environment requires consideration of two broad factors, context

24  and intensity.  As the Ninth Circuit explained in Nat'l Parks &

25  Conservation Ass'n v. Babbitt, 241 F.3d 722, 730 (9th Cir. 2001):

26          "Context simply delimits the scope of the agency's action,
           including the interests affected.  Intensity relates to the
27          degree to which the agency action affects the locale and
           interests identified in the context part of the inquiry."

28

1    NEPA regulations provide relevant factors for evaluating
2    intensity, including, *inter alia*:

3       (2) The degree to which the proposed action affects public
        health and safety.
4       ...

5       (4) The degree to which the effects on the quality of the
        human environment are likely to be highly controversial.
6
7       (5) The degree to which the possible effects on the human
        environment are highly uncertain or involve unique of
        unknown risks.
8       ...

9       (7) Whether the action is related to other actions with
        individually insignificant but cumulatively significant
10      impacts.  Significance exists if it is reasonable to
        anticipate a cumulatively significant impact on the
11      environment.  Significance cannot be avoided by terming an
        action temporary or by breaking it down into small component
12      parts.
        ...
13
14      (9) The degree to which the action may adversely affect an
        endangered or threatened species or its habitat that has
        been determined to be critical under the Endangered Species
15      Act of 1973.

16   40 C.F.R. § 1508.27(b).

17   The presence of one such factor may be sufficient to deem
18   the action significant in certain circumstances.  <u>Ocean Advocates</u>
19   <u>v. United States Army Corps. Of Eng'rs</u>, 361 F.3d 1108, 1125 (9th
20   Cir. 2004).  If substantial questions are raised as to whether a
21   project may have a significant effect on the environment, an EIS
22   should be prepared.  <u>Save the Yaak Committee v. Block</u>, 840 F.2d
23   714, 717 (9th Cir. 1988).  "An agency's decision not to prepare
24   an EIS will be considered unreasonable if the agency fails to
25   supply a convincing statement of reasons why potential effects
26   are insignificant."  <u>Id</u>.

27   In addition to arguing that the Forest Service violated NEPA
28   by failing to prepare an EIS in this case, Plaintiffs also

-13-

contend that the Forest Service's designation of trees to be cut
by designation, as opposed to individual marking, violates the
NFMA, which requires that "resource plans and permits, contracts,
and other instruments for the use and occupancy of National
Forest Systems lands shall be consistent with the land management
plans."  16 U.S.C. § 1604(i).  Consequently, all activities in
Forest Service forests, including timber projects, must be
determined to be consistent with the governing forest plan, which
is a broad, programmatic planning document.  *See, e.g.,*
Wilderness Society v. Thomas, 188 F.3d 1130, 1132 (9th Cir.
1999).

Because neither NEPA nor NFMA contains provisions allowing a
private right of action (*see* Lujan v. National Wildlife
Federation, 497 U.S. 871, 882 (1990) and Ecology Center Inc. v.
United States, 192 F.3d 922, 924 (9th Cir. 1999) for this
proposition under NEPA and NFMA, respectively), a party can
obtain judicial review of alleged violations of NEPA and NFMA
only under the waiver of sovereign immunity contained within the
Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

Under the APA, the court must determine whether, based on a
review of the agency's administrative record, agency action was
"arbitrary and capricious", outside the scope of the agency's
statutory authority, or otherwise not in accordance with the law.
Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1356
(9th Cir. 1994).  Review under the APA is "searching and
careful."  Ocean Advocates, 361 F.3d at 1118.  However, the court
may not substitute its own judgment for that of the agency.  Id.
(citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401

-14-

1  U.S. 402 (1971), overruled on other grounds by <u>Califano v.</u>
2  <u>Sanders</u>, 430 U.S. 99 (1977)).

3      In reviewing an agency's actions, then, the standard to be
4  employed by the court is decidedly deferential to the agency's
5  expertise.  <u>Salmon River</u>, 32 F.3d at 1356.  Although the scope of
6  review for agency action is accordingly limited, such action is
7  not unimpeachable.  The reviewing court must determine whether
8  there is a rational connection between the facts and resulting
9  judgment so as to support the agency's determination.  <u>Baltimore</u>
10 <u>Gas and Elec. v. NRDC</u>, 462 U.S. 87, 105-06 (1983), *citing* <u>Bowman</u>
11 <u>Trans. Inc. v. Arkansas-Best Freight System Inc.</u>, 419 U.S. 281,
12 285-86 (1974).  In short, the court must ensure that the agency
13 has taken a "hard look" at the environmental consequences of its
14 proposed action.  <u>Oregon Natural Resources Council v. Lowe</u>, 109
15 F.3d 521, 526 (9th Cir. 1997).

16

17              **AUGMENTATION OF THE ADMINISTRATIVE RECORD**

18

19      The Forest Service has moved to strike certain evidence
20 offered by Plaintiffs in conjunction with the summary judgment
21 motions presently before the Court.  Specifically, the Forest
22 Service asserts that because the Declarations of Monica Bond,
23 Jennifer Blakesley, and Dennis Odion, along with the Supplemental
24 Declaration of Chad Hanson, were not part of the underlying
25 administrative record they should be disregarded.  Defendants
26 make the same argument with regard to certain attachments to the
27 Declaration of George Torgun.  In response, Plaintiffs have not
28 only argued that inclusion of the above materials is appropriate,

                              -15-

but they have also moved to supplement the record to include several additional items (a supplemental declaration from Dennis Odion, the Declaration of Don C. Erman, and four attachments to the Declaration of Rachel M. Fazio).

The Forest Service correctly points out that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." Camp v. Pitts, 411 U.S. 138, 142 (1973); Southwest Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996). The rationale for this general rule is that the reviewing court should determine agency compliance with the law solely on the record before the agency at the time of its decision. *See* Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 419 (1971). Limiting review in that regard precludes the reviewing court from conducting a *de novo* trial and substituting its opinion for that of the agency. *See* id. at 416.

Consideration of extra-record evidence may nonetheless be justified (1) if necessary to determine "whether the agency has considered all relevant factors and has explained its decision"; (2) if "the agency has relied on documents not in the record"; (3) "when supplementing the record is necessary to explain technical terms or complex subject matter"; or (4) when plaintiffs make a showing of agency bad faith." Lands Council v. Powell, 379 F.3d 738, 747 (9th Cir. 2004). These exceptions "operate to identify and plug holes in the administrative record." Id.

The Blakesley, Bond, Odion and Hanson declarations all

-16-

1  consist of scientific opinion testimony criticizing the adequacy
2  of the Forest Service's analysis of MVP effects on the California
3  spotted owl and on fire risk.  These declarations all pertain to
4  Plaintiffs' claim that significant environmental impacts were
5  ignored in the MVP EA, and that consequently, the provisions of
6  NEPA were violated.  The Odion declaration, for example, relates
7  to the sufficiency of the Forest Service's analysis of project
8  fire risk, and purports to explain complex matters dealing with
9  the science of fire risk.  Hence the Odion declaration falls
10 within the first and third exceptions to the administrative
11 record review as articulated by the Ninth Circuit in Lands
12 Council.

13      The Blakesley and Bond declarations argue that the Forest
14 Service failed to sufficiently consider the effects of the
15 project on the California spotted owl, and hence pertain to
16 Plaintiffs' NEPA claim as well.  The attachments to the Torgun
17 Declaration also relate to Plaintiffs' assertion, under NEPA,
18 that cumulative effects of the MVP were not properly considered.[7]
19 The same arguments apply to the additional declarations and
20 evidence that Plaintiffs separately request be included within
21 the administrative record.

22          In cases challenging the adequacy of agency review
23 under NEPA, the Ninth Circuit has routinely admitted extra-record
24 evidence to show that the agency failed to consider all relevant

25
26      [7]Although of more attenuated relevance to the Lands Council
    factors as delineated above, the supplemental Hanson declaration
    is offered to aid the Court, through photographs, in
27  understanding Plaintiffs' argument that some units within the
    project area had previously been adequately treated for fire risk
28  reduction.  It will be accepted on that basis.

1   factors in assessing potential environmental effects. *See, e.g.,*

2   Idaho Conservation League v. Mumma, 956 F.2d 1508, 1520 n. 22

3   (9th Cir. 1992); City of Davis v. Coleman, 521 F.2d 661, 675 (9th

4   Cir. 1975); Natural Resources Defense Council v. Duvall, 777 F.

5   Supp. 1533, 1534 n. l (E.D. Cal. 1991).   In Environment Now! v.

6   Espy, 877 F. Supp. 1397, 1404 (E.D. Cal. 1994), this district

7   permitted expert declarations in order to highlight perceived

8   deficiencies in the environmental review process and to explain

9   and assist understanding the complex and technical subject matter

10  underlying the agency decision at issue.

11      This liberality in allowing consideration of material beyond

12  the record makes sense given the fact that NEPA requires the

13  court to make a "substantial inquiry" into the nature of a

14  federal agency's NEPA compliance. *See* Citizens to Preserve

15  Overton Park v. Volpe, 401 US. at 415.   As the Ninth Circuit

16  pointed out in Asarco Inc. v. United States Environmental

17  Protection Agency, 616 F.2d 1153, 1160 (9th Cir. 1980), "it will

18  often be impossible, especially when highly technical matters are

19  involved, for the court to determine whether the agency took into

20  consideration all relevant factors unless it looks outside the

21  record to determine what matters the agency should have

22  considered but did not."

23      Given these considerations, and because the materials at

24  issue herein all relate to NEPA claims, they will be considered

25  by this Court.   Consequently, the Forest Service's Motion to

26  Strike is denied and Plaintiffs' request to augment the record is

27  granted.

28

-18-

1

2

3                        **STANDARD OF REVIEW**

4

5           The Federal Rules of Civil Procedure provide for

6   summary judgment when "the pleadings, depositions, answers to

7   interrogatories, and admissions on file, together with

8   affidavits, if any, show that there is no genuine issue as to any

9   material fact and that the moving party is entitled to a judgment

10  as a matter of law."  Fed. R. Civ. P. 56(c).  One of the

11  principal purposes of Rule 56 is to dispose of factually

12  unsupported claims or defenses.  <u>Celotex Corp. v. Catrett</u>, 477

13  U.S. 317, 325 (1986).  Under summary judgment practice, the

14  moving party

15          "always bears the initial responsibility of informing the
            district court of the basis for its motion, and identifying
16          those portions of 'the pleadings, depositions, answers to
            interrogatories, and admissions on file together with the
17          affidavits, if any,' which it believes demonstrate the
            absence of a genuine issue of material fact."
18
    <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting Rule
19
    56[c).
20
            If the moving party meets its initial responsibility, the
21
    burden then shifts to the opposing party to establish that a
22
    genuine issue as to any material fact actually does exist.
23
    <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574,
24
    585-587 (1986); <u>First Nat'l Bank v. Cities Ser. Co.</u>, 391 U.S.
25
    253, 288-289 (1968).
26
            In attempting to establish the existence of this factual
27
    dispute, the opposing party must tender evidence of specific
28

                                  -19-

1  facts in the form of affidavits, and/or admissible discovery

2  material, in support of its contention that the dispute exists.

3  Fed. R. Civ. P. 56(e).  The opposing party must demonstrate that

4  the fact in contention is material, i.e., a fact that might

5  affect the outcome of the suit under the governing law, and that

6  the dispute is genuine, i.e., the evidence is such that a

7  reasonable jury could return a verdict for the nonmoving party.

8  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52

9  (1986).

10       Summary judgment is appropriate in cases, like the present

11  matter, which involve judicial review of administrative action

12  where review is based upon an administrative record.  National

13  Wildlife Fed'n v. Babbitt, 128 F. Supp. 2d 1274, 1289 (E.D. Cal.

14  2001), see also Northwest Motorcycle Ass'n v. U.S. Dept. Of

15  Agriculture, 18 F.3d 1468 (9th Cir. 1994).

16

17

18                              **ANALYSIS**

19

20  A.  Impact on the California Spotted Owl

21

22       The parties do not dispute that the California spotted owl

23  is a territorial species that preferentially utilizes habitat

24  near and around its nest tree.  Plaintiff's Undisputed Fact

25  ("PUF") No. 20.  For that reason, 300 acres have been set aside

26  as PACs around each nesting site.  The MVP leaves those PACs

27  completely intact, and further leaves intact an additional 1,000

28  acres of foraging area, or SOHA, within a 1.5 mile radius of each

                              -20-

nesting site.  15 AR 5497.

It is the MVP's impact on the HRCAs, which as stated above are the 700 acres immediately surrounding each PAC, that is at issue.  As indicated above, sixteen HRCAs located within the MVP area would be impacted by the proposed logging.  12 AR 4368. Approximately one-third of the MVP group selection areas are located within HRCAs, some directly adjacent to owl PACs.  12 AR 4489.   Given the Forest Service's admission that all of the 4,281 acres of suitable owl habitat falling within the project area could be rendered unsuitable by the MVP (PUF No. 50; 12 AR 4439-40), Plaintiffs contend that such impact would create a risk of decreased California spotted owl survival and reproduction in the project area, even if California spotted owl occupancy remains stable, and would contribute to the need to eventually list the owl under the Endangered Species Act.  Blakesley Decl. ¶¶ 7-11; Bond Decl. ¶¶ 16-23, 38-39.

In addition, aside from the 6,440 acres Meadow Valley Project itself, Plaintiff argue that there are an additional 14 PACs and associated HRCAs within the greater 85,919 acre wildlife analysis area that may be indirectly adversely impacted, as well as 15 more such areas just outside the analysis area.  According to Plaintiffs, the EA has failed to adequately take these considerations, and the cumulative impacts these pose, into account.

The MVP EA states that the project alternative selected (Alternative C) has a higher risk for adversely affecting the California spotted owl because it deviates more significantly from prior California spotted owl management strategy and does

-21-

1   create structurally unsuitable habitat across the project area by

2   reducing canopy closure and old forest conditions.  13 AR 4824.

3   Although the EA goes on to conclude that California spotted owl

4   population/occupancy in the greater wildlife analysis area is not

5   expected to diminish overall as a result of the project (12 AR

6   4438), Plaintiffs assert that this conclusion is conclusory and

7   lacks the quantified analysis to survive NEPA scrutiny.

8   According to Plaintiffs, the EA makes no more than "general

9   statements about possible effects and some risk" that are

10  insufficient to constitute the "hard look" required by NEPA.

11  Klamath-Siskiyou Wildland Center v. Bureau of Land Mgmt., 387

12  F.3d 989, 993-94 (9th Cir. 2004).

13      Specifically, Plaintiffs maintain that the EA fails to

14  discuss several reasonably foreseeable future actions

15  implementing the QLG Act pilot project that had been proposed or

16  planned at the time the MVP was approved.  (Pl's Opening Brief,

17  26:5-7).  To that end, Plaintiffs maintain that the Empire,

18  Basin, Watdog and Slapjack projects were are well along in the

19  planning process when the MVP was approved, yet the EA fails to

20  consider those projects or evaluate their potential cumulative

21  effects in conjunction with the MVP.

22      Plaintiffs also take issue with the EA's conclusion that the

23  project-specific effects of the Forest Service's proposed actions

24  are not likely to be considered "highly controversial" (13 AR

25  4815), and hence do not require preparation of a full EIS.

26  Plaintiffs point to the declarations of their own scientists to

27  create the requisite controversy.  Additionally, in arguing that

28  the effects of the MVP are also "highly uncertain" and merit

-22-

1  preparation of an EIS on that basis as well (See 40 C.F.R. §
2  1508.27(b)(5)), Plaintiffs point to the Forest Service's own
3  previous findings as proof of such uncertainty.  They emphasize
4  that the MVP is the first major project to fully implement the
5  QLG-prescribed group selection and DFPZ treatments without
6  previously recognized California spotted owl habitat protections.

7       In countering Plaintiffs' argument that it failed to
8  adequately consider the cumulative effects of the project, the
9  Forest Service first argues that Plaintiffs' failure to
10 specifically raise the projects not considered by the Forest
11 Service precludes Plaintiffs from now raising those unexhausted
12 contentions.  The Forest Service points out that in order to
13 challenge an administrative decision in Federal court, a
14 plaintiff must first exhaust all available remedies required by
15 statute.  In that regard, the Forest Service contends that the
16 issues raised in an administrative appeal must be delineated in
17 sufficient detail to provide notice to the Forest Service to
18 rectify any alleged violations.  <u>Native Ecosystems Council v.</u>
19 <u>Dombeck</u>, 304 F.3d 886, 899 (9th Cir. 2002).  The Forest Service
20 maintains that Plaintiff failed to meet their exhaustion
21 requirement because they neglected to specifically raise the
22 Empire, Basin, Watdog and Slapjack projects now identified in
23 this lawsuit.

24      This argument fails for several reasons.  First, the
25 cumulative impacts issue arises in the context of Plaintiffs'
26 NEPA claims and neither NEPA itself, nor NEPA's implementing
27 regulations, contain an exhaustion requirement.  Consequently the
28 statutes in question do not mandate exhaustion.  See <u>Darby v.</u>

1  <u>Cisneros</u>, 509 U.S. 137, 146-47 (1993).  To the contrary, in

2  claims arising under NEPA, "the Forest Service has a duty to

3  address cumulative action regardless of whether plaintiffs

4  complain of violations."  <u>Sierra Club v. Bosworth</u>, 199 F. Supp.

5  2d 971, 988 (N.D. Cal. 2002); *see also* <u>California v. Bergland</u>,

6  483 F. Supp. 465, 472, n. 5 (E.D. Cal. 1980)(noting that "there

7  appear to be no administrative remedies to exhaust before suing

8  under NEPA").  Finally, as Plaintiffs point out, they

9  participated in the comment and administrative appeals process

10 for the MVP, and the record documents several instances where

11 Plaintiffs raised the Forest Service's alleged failure to

12 consider cumulative impacts in any event.  (*See* Pls.' Opp'n to

13 Def.'s Mot. for Summ. J., pp. 15-17).

14      Plaintiffs' cumulative effect argument nonetheless fails to

15 pass muster when considered on its merits.  As the Forest Service

16 points out, although the MVP itself comprises only some 6,400

17 acres, in defining the wildlife analysis area for purposes of the

18 project EA, and in assessing cumulative effects, an area more

19 than twelve times as large was selected, based on the lines of

20 the next outlying HRCA beyond each HRCA where project activity

21 would occur.  *See* 12 AR 4489 (displaying relationship between

22 treatment zones, wildlife analysis areas and owl PACs and HRCAs;

23 *see also* 12 AR 4351 (defining the analysis area as "the project

24 area plus an additional larger land base, determined by spotted

25 owl distribution, that may be affected by cumulative effects,

26 totaling approximately 85,919 acres").  Significantly, defining

27 the geographic area for assessment purposes is "a task assigned

28 to the special competency of the appropriate agencies," and such

-24-

1  decisions are given deference.  Kleppe v. Sierra Club, 427 U.S.

2  390, 414 (1976); see also Selkirk Conservation Alliance v.

3  Forsgren, 336 F.3d 944, 959-960).

4  Forest Service formulation of the 85,919 acre wildlife

5  analysis area here is accordingly entitled to deference under

6  that standard.  All of the future projects[8] Plaintiffs claim

7  should have been analyzed are outside the cumulative effects

8  analysis area.  See Bednarski Decl., Attach. 1.  The Forest

9  Service is not obligated under NEPA to discuss how a proposed

10 project like the MVP would affect California spotted owl

11 population outside a reasonably selected wildlife analysis

12 boundary.  See, e.g., Inland Empire Pub. Lands Council v. U.S.

13 Forest Serv., 88 F.3d 754, 757 (9th Cir. 1996).

14 While Plaintiffs rely on the Ninth Circuit's decision in

15 Klamath-Siskiyou, supra, that case dealt with future project

16 planned in the same watershed that had originally been conceived

17 as a single project.  387 F.3d at 992.  The present case is

18 distinguishable given the size of the analysis area as well as

19 the fact that said area was based on California spotted owl

20 distribution.  Consequently the Forest Service here appears to

21 have determined the boundaries of its analysis area with

22

23 [8]While Plaintiffs' cumulative effects argument appears to be
   primarily centered on an alleged failure to properly consider
24 certain future projects falling outside the analysis area, with
   respect to past and ongoing projects, the BA/BE for the MVP EA
25 identified numerous timber sale projects within the analysis
   area, described the silvicultural system used, and the extent of
26 anticipated effects.  See 12 AR 4397-4402, 4434-4438, 4439.  The
   number of acres treated or otherwise affected for some 14 past
27 and ongoing projects is listed, and the cumulative potential
   reduction on spotted owl habitat is thereafter considered.  This
28 is sufficient for NEPA purposes.

1  cumulative effects in mind, as required by NEPA.  <u>Selkirk</u>, 336

2  F.3d at 958.

3      As indicated above, in addition to arguing that cumulative

4  effects have not been properly considered, Plaintiffs also

5  maintain that an EIS is warranted because the MVP failed to

6  consider the extent to which its proposed action would affect the

7  California spotted owl in other respects.  Plaintiffs

8  specifically contend that impacts on the California spotted owl

9  also "significantly affect" the environment because they are

10 "highly controversial" and because the risks entailed are

11 "uncertain or involve unique or unknown risks".  *See* 40 C.F.R. §

12 1508.27(b)(4), (5).[9]

13     Contrary to Plaintiffs' protestations, the MVP EA does take

14 a "hard look" at impacts to the California spotted owl and

15 concludes, as articulated by the Forest Service, that the impacts

16 would not be significant for six reasons.  First, as indicated

17 above, there would be no project activity in any PACs or SOHAs.[10]

18

19    [9]The Court recognizes that the degree to which an action may
   adversely affect an endangered or threatened species or its
20 habitat should also be considered, but merges that factor with
   the highly controversial and uncertain aspects discussed below,
21 particularly given the fact that the California spotted owl is
   not a listed species under the ESA.  Even if the owl were so
22 listed, however, the mere presence of a threatened or endangered
   species in the project area does not necessarily mean that the
23 action would be significant as defined by Section 1508.27(b)(9).
   *See* <u>Southwest Ctr. for Biological Diversity v. U.S. Forest Serv.</u>,
24 100 F.3d 1443, 1450 (9th Cir. 1996).  Finally, with respect to
   the effect of the action on public health and safety pursuant to
25 Section 1508.27(b)(2), those considerations will be discussed
   with respect to potential fire risks stemming from the project,
26 also discussed *infra*.

27    [10]Plaintiffs also argue that the Forest Service failed to
   identify or assess a larger "biological home range" of the
28                                              (continued...)

*See* 13 AR 4824, 12 AR 4428.  Second, when analyzed throughout the wildlife analysis area, the vast bulk of existing foraging habitat (87 percent) and nesting habitat (95 percent) would be retained.  13 AR 4824, *see also* 12 AR 4455.[11]  Third, "96% of the combined acreage of PACs and HRCAs would not be treated."  13 AR 4824.  Fourth, of the 30 HRCAs situated within the wildlife analysis area, sixteen would be reduced only by an average of 7 to 8 percent.  <u>Id</u>.  Fifth, the Forest Service found that the three PAC/HRCAs subject to the greatest suitable habitat reduction had not been occupied by owls for the preceding two years.  13 AR 4824, *see also* 12 AR 4455.  Finally, as discussed in more detail below, the fact that DFPZs are designed to reduce the risk of a catastrophic crown fire will actually safeguard the canopy cover critical to California spotted owl habitat.  *See* 13 AR 4824; 12 AR 4433, 4455.

Moreover, in concluding that the previous 1999 ROD

---

[10](...continued)
California spotted owl, of which they maintain that the HRCAs comprise only some 20 percent, with 30-40 percent of owl activity occurring in the portion of the home range outside the HRCA. (*See* Pl's Opp. to Defs.' Mot. for Summ. J., 19:13-15).  By defining the wildlife analysis area at 85,919 acres, however, as opposed to the 6,400 acres contained within the project itself, the Forest Service allowed for the possibility that the California spotted owl's actual home range exceeded HRCA size.

[11]The Forest Service estimates that some 26,300 acres of foraging habitat would remain within the analysis area.  12 AR 4367-68.  This conclusion was reached through analysis of existing vegetative conditions, as determined by canopy closure assessment through the California Wildlife Relationship ("CWHR") system, which assigns categories based on tree size and canopy cover.  *See* 12 AR 4469.  The cumulative changes in CWHR types for each alternative contemplated by the MVP were considered.  See 12 AR 4390-92.  Hence Plaintiffs' assertion that the MVP fails to consider effects on owl foraging habitat appears misplaced.

unnecessarily "took a worst case approach to estimating effects" on California spotted owl habitat (by assuming that group selection/DFPZ construction would render 100 percent of impacted habitat unsuitable (*see* MRR 55; *see also* 4 AR 1402), the Forest Service found that past fuel reductions in owl nesting habitat "actually reduced that habitat by less that one percent of the acreage treated," rather than 100 percent.   MRR at 55.   The team reviewing the 199 ROD further explained:

> "Considering all timber strata used by owls for nesting, past projects reduced only six percent of the acres of habitat treated to lower quality habitat strata. Even assuming the Pilot Project would double the highest percentage of reductions in habitat within treated areas previously experienced (six percent); the projected reductions in owl habitat would only be 12 percent of the 100 percent used in the analysis."

Id.

Examination of the MVP BE also indicates that project effects of fragmentation and loss of connectivity of California spotted owl habitat were considered.   Although recognizing that group selection would create some "low-moderate density openings within stands" (12 AR 4432), the Forest Service determined that the size of these gaps would still "meet the definition of continuous forest cover" previously formulated by California spotted owl habitat guidelines.   12 AR 4432, 4438; 15 AR 5465. The Forest Service biologist went on to conclude that this would not significantly impact the California spotted owl because the canopy openings would be low to moderate in extent, and because other structural elements like retained large trees, downed logs and snags would mitigate against habitat barriers.   *See* 12 AR 4432.   The Forest Service further noted that historical

1  understory densities were discontinuous and that understory
2  elements can return relatively quickly.  Id.[12]

3      In addition to analyzing impact on California spotted owl
4  habitat, the EA defends its conclusion that California spotted
5  owl occupancy would not be reduced with scientific support also
6  providing a reasonable basis for the Forest Service to have
7  concluded that potential effects to California spotted owls would
8  not be significant.  A Forest Service biologist examined 16 HRCAs
9  which would be directly affected by the MVP (see 12 AR 4431), and
10  for each such HRCA analyzed the likelihood of occupancy based on
11  past data on reproduction and pair occupancy in the associated
12  PAC. See 12 AR 4475.  The biologist further assessed the
13  percentage portion of the HRCAs subject to treatment along with
14  the number of acres of suitable habitat to be harvested.  Based
15  on those figures, the degree of potential risk to PAC viability
16  was calculated and considered.  12 AR 4427-4440.

17      In determining that the degree and distribution of habitat
18  impacts would not lead to changes in California spotted owl
19  occupancy or threaten the species' viability (see 15 AR 5467),
20  the Forest Service relied in part on similar silvicultural and
21  fuel treatments, as well as other improvements, that have been
22  implemented on the Mount Hough Ranger District in recent years.
23  13 AR 4816.

24      The mere existence of opposition to a project does not

25  _____

26  [12]The Forest Service also evaluated effects on California
spotted owl prey base, and determined that structural elements
retained for owl habitat (like snag retention and downed logs)
27  would also provide habitat for species preyed on by the
California spotted owl like woodrats and flying squirrels.  See
28  12 AR 4434.

-29-

1  automatically render it controversial; it is only one factor to

2  be considered in whether an EIS must be prepared.  <u>Greenpeace</u>

3  <u>Action v. Franklin</u>, 14 F.3d 1324, 1333 (9th Cir. 1992; <u>Cold</u>

4  <u>Mountain v. Garber</u>, 375 F.3d 884, 893 (9th Cir. 2004).  While

5  Plaintiffs asserted during oral argument that anything impacting

6  California spotted owl habitat is by its very nature

7  controversial, that position is unfounded.  Instead, a

8  substantial question as to significant environmental degradation

9  is required in order to cast serious doubt as to the

10 reasonableness of an agency's determination.  <u>Nat'l Parks v.</u>

11 <u>Babbitt</u>, 241 F.3d at 736.  Plaintiffs have not identified

12 concerns rising to that level in this case.

13      Similarly, in concluding that project risks to the

14 California spotted owl are neither uncertain nor unknown, as

15 indicated above the Forest Service addressed direct effects to

16 California spotted owl habitat on sixteen PACs/HRCAs, the

17 indirect effect of the project on thirty others, and the extent

18 to which suitable habitat within each HRCA was impacted. 12 AR

19 4427-4432; <i>see also</i> 15 AR 5462.  The Forest Service also pointed

20 to its experience with similar projects in concluding that

21 anticipated project effects were not unknown.  13 AR 4816.  In

22 addition, and in any event, "NEPA regulations do not require a

23 reviewing agency to eliminate all uncertainty prior to issuing a

24 [finding of no significant impact]."  <u>Northwest Envtl. Def. Ctr.</u>

25 <u>v. Wood</u>, 947 F. Supp. 1371, 1385 (D. Or. 1996)

26      Taken as a whole, the EA and supporting documents adequately

27 evaluated the potential impact to the California spotted owl

28 posed by the MVP, and reasonably concluded that no significant

effects would result.  Invalidating the scientific analysis
undertaken by the Forest Service in the EA would force this Court
to choose between competing expert opinions, a position it should
avoid.  *See* <u>Greenpeace Action v. Franklin</u>, 14 F.3d 1324, 1333 (9th
Cir. 1992).  In addition, the fact that Plaintiffs have produced
scientists disagreeing with the agency's conclusions does not
render the agency's conclusions invalid.  *See* <u>City of Carmel-by-</u>
<u>the-Sea v. U.S. Dep't of Transp.</u>, 123 F.3d 1142, 1151-52 (9th Cir.
1997) ("When specialists express conflicting views, an agency
must have discretion to rely on the reasonable opinions of its
own qualified experts even if, as an original matter, a court
might find contrary views more persuasive.").

        In reviewing the Forest Service's decision not to prepare an
EIS in this case, this Court will only assess whether its
decision is "based on a 'reasoned evaluation of the relevant
factors.'"  <u>Nat'l Envtl. Def. Ctr. v. Bonneville Power Admin.</u>,
117 F.3d 1520, 1536 (9th Cir. 1997).  The Court concludes that
such a reasoned evaluation occurred here with respect to
potential impacts of the MVP on the California spotted owl.
Consequently no EIS is mandated, and the Forest Service is
entitled to judgment as a matter of law.


B.  <u>Potential Fire Risk/Resilience Associated with Project</u>
<u>Activity</u>

        Plaintiffs also claim that the fuel treatment anticipated by
the MVP "will *increase* the potential for, and risk of, severe
fire in the project area."  Pls' Mem. At 10.  In support of their
argument in that regard Plaintiffs allege that slash, or

1   flammable logging debris, will be left on site.  Plaintiffs

2   further contend that opening the forest canopy through

3   construction of group selection units will facilitate the growth

4   of highly flammable underbrush and will result in drier

5   conditions more conducive to fire.  In arguing that these factors

6   also require preparation of an EIS, Plaintiffs contend that the

7   project affects "public health and safety".  40 C.F.R. §

8   1508.27(b)(2).  Plaintiffs further assert that the MVP runs

9   counter to the stated objective of the QLG Act in decreasing fire

10  risk and achieving fire resilient forests.

11        These concerns appear unfounded.  Initially, it should be

12  noted that a key objective of the project is to reduce the risk

13  of the Meadow Valley community to lightning-induced fires,

14  several of which have threatened the community since 1999.  The

15  contemplated group selection units, in providing a fuel break,

16  are designed to slow the advance of fire igniting in or near

17  those units.  *See* 15 AR 5480-81.[13]  In addition, the MVP DFPZs are

18  intended as part of a larger strategic system of DFPZs that

19  provide safer locations from which firefighters may operate in

20  the event of wildfire.  13 AR 4743.  The DFPZs, as designed, also

21  serve to reduce the possibility of a catastrophic crown fire that

22  would remove forest cover and, consequently, California spotted

23

24

25

_____

26        [13]As the Record also indicates, some group selection units
    may slow the initial spread of a fire, ignited inside or
27  immediately adjacent to such units, from its point of origin,
    giving firefighters more time to implement effective suppression
28  action.  13 AR 4869; *see also* 13 AR 4795.

1 owl habitat.  13 AR 4824.[14]

2     The QLG Act is also designed to increase long-term fire

3 resilience by promoting development of an all-age, multistory

4 forest more akin to Sierra Nevada forests that existed prior to

5 European settlement and twentieth century forest management.  *See*

6 QLG Act § 401(d)(2).  By opening the canopy and facilitating

7 grown of more shade-intolerant (and fire resistant) pine trees,

8 overall fire resilience is improved.[15]  *See* Skinner Decl. ¶¶ 6-7,

9 10-11.  The EA adequately evaluated the potential effects of the

10 MVP on fire and fuels and reasonably concluded that an EIS was

11 not required.  *See* 13 AR 4795 (discussing effects of group

12 selection on fire and fuels); 13 AR 4864-4887 (Fire/Fuels

13 Report).

14     With respect to Plaintiffs' specific arguments concerning

15 fire risk, the MVP does require treatment of logging slash,

16 contrary to Plaintiffs' assertion.  The timber contracts that

17 will be used to implement the project will contain provisions

18 requiring that slash be remediated.  *See, e.g.,* 16 AR 5781, 5935

19 _____

20     [14]Although Plaintiffs argue that a small portion of acreage
selected for group selection units (108 acres) and DFPZs (84
21 acres) had already been treated for fuel reductions, the
Declarations of James M. Peña and Carl Skinner proffered by the
22 Forest Service adequately explain why retreatment of these
relatively small areas was indicated.  *See* Peña Decl., ¶¶ 17-22;
23 Skinner Decl., ¶ 19.

24     [15]Although Plaintiffs also argue the Forest Service's
promotion of pine growth is not recommended for higher elevation
25 forests and contend that group selection is consequently not
indicated on that basis, as the Forest Service points out, the
26 overwhelming majority of group units are located below 5500 feet,
and the vast majority of groups located above 5500 feet are
27 located on south facing exposures, which are hotter and drier,
and therefore more able to support ponderosa pine.  *See* Forest
28 Service Reply Mem., 39:8-11).

-33-

1  (Provision B6.7); 16 AR 5821-23, 5977-79 (Provision C6.7).  As

2  explained in response to comments generated by the EA:

3      "[A]fter tree removal in group selection units, activity-
       created fuels in the unit would be treated by one or more of
4      the following methods: piling and burning, underburning,
       mastication, or by no treatment at all where residual
5      surface fuels are at an acceptable level.  Trees from group
       selection units would be yarded whole to landings. Excessive
6      surface fuels on landings not chipped and removed as biomass
       would be treated with prescribed fire.  Excessive surface
7      fuels created in group selection units would not go
       untreated."

8

9  15 AR 5480; *see also* 13 AR 4794 ("[r]esidue from group selection

10 and DFPZ construction would be burned, so that surface fuels

11 would be decreased.").[16]  With respect to timing of these

12 treatments, the timber contracts require a schedule for

13 completion of slash treatment prior to commencement of logging

14 operations.  16 AR 5821.  Burn piles within group selection units

15 are anticipated to be burned with one year.  15 AR 5470.

16 Consequently, Plaintiffs' assertion that slash will remain

17 untreated indefinitely is not supported by the record.

18     Plaintiffs also argue that whole tree yarding, pursuant to

19 which trees are cut into pieces and then removed intact, is only

20 required for smaller trees less than 20 inches in diameter, while

21 larger trees generating more slash may be shorn of limbs before

22 being cut into pieces and skidded to landings.  *See* 16 AR 5817.

23 In making that argument, Plaintiffs contend that the term

24

25     [16]Although Plaintiffs assert that slash will be treated in
   the great majority of the project area by simply scattering it to
26 as much as an 18 inch depth in given logging units (*see* Pls.'
   Opp. To Defs.' Mot. for Summ. J., 6:2-3), such scattering appears
27 to be contemplated only for treatment along roads and in DFPZ
   units prior to underburning, and is not planned for group
28 selection units.  *See* Forest Service's Reply Mem., 35:15-18).

                              -34-

1    "bucked" means that log branches are removed.  The Forest
2    Service, however, in response, points out that the term "bucking"
3    actually refers to sawing felled trees into shorter lengths, as
4    opposed to "limbing" which entails branch or limb removal.  In
5    fact, the project requires that all trees be whole yarded, and
6    only the butt log sections of trees greater than 20 inches in
7    diameter can be limbed.  Because the "butt log" is defined[17] as
8    "the first log cut above the stump", and because the lower
9    portions of larger trees typically have few if any branches, the
10   Forest Service maintains that little slash debris would result.
11   That conclusion makes sense.

12        With respect to Plaintiffs' assertion that flammable
13   vegetation will rapidly regrow in treated areas, thereby
14   increasing fire risk, the Forest Service notes that brush growth
15   is not highly flammable until after 20-30 years of brush growth,
16   and points out that overstory tree growth will occur in the
17   treated areas prior to that time.  15 AR 5480.

18        Finally, Plaintiffs also pose the general argument that
19   construction of DFPZs and group selection units, as envisioned by
20   the MVP, will create hot and dry conditions that facilitate fire.
21   *See* Decl. of Dennis Odion, ¶¶ 13-14.  As indicated above,
22   however, the the EA outlines why the Forest Service concluded
23   that the project does have beneficial effects in terms of
24   decreasing fire risk and promoting fire resilience.  In addition,
25   Plaintiffs have no demonstrated that slash residue poses an
26   unacceptable risk triggering the need for an EIS.

27

28        [17]Pertinent forestry terms, including both "butt log" and
     "bucking", are defined in Fed. Defs.' Ex. E.

1   The fire risk/resilience portion of the MVP passes muster

2   under both NEPA and the QLG Act.  While Plaintiffs' experts

3   disagree, the Forest Service's informed judgment in this case is

4   entitled to deference.  <u>Marsh v. Or. Natural Res. Council</u>, 490

5   U.S. 360, 378 (1989) ("Because analysis of the relevant documents

6   'requires a high level of expertise,' we must defer to the

7   'informed discretion of the responsible federal agencies.'")

8   (*quoting* <u>Kleppe</u>, 427 U.S. at 412).  Consequently the Forest

9   Service is entitled to judgment as a matter of law as to the fire

10  risk/resilience issues as well, in that an EIS is not required

11  under the circumstances and that no QLG Act violation has

12  occurred.

13

14  <u>C.  Designation, Rather than Individual Marking, of Trees to be</u>

15  <u>Cut</u>

16      In addition to the claimed NEPA violations outlined above,

17  Plaintiffs also contend that the MVP violates the NFMA by failing

18  to mark the trees to be removed in proposed group selection

19  units.  According to Plaintiffs, the designation of trees to be

20  logged by description is inadequate to meet the requirements of

21  the NFMA.

22      Section 472a(g) of the NFMA provides in pertinent part as

23  follows:

24      "[d]esignation, marking when necessary, and supervision of
        harvesting of trees, portions of trees shall be conducted by
25      persons employed by the Secretary of Agriculture.  Such
        persons shall have no personal interest in the purchase or
26      harvest of such products and shall not be directly or
        indirectly in the employment of the purchase thereof."
27
        Despite the fact that the language of the statute itself
28

-36-

1  indicates that marking is only required "when necessary",

2  Plaintiffs assert that designation is appropriate only when all

3  trees in a given area are either to be removed or retained.[18]

4  They argue that because the MVP calls for a mix of trees to be

5  removed or retained in the group selection units, the Forest

6  Service is obligated by statute to individually mark the trees

7  slated for removal.

8      Individual marking is not necessary in this case because the

9  timber contracts in question unequivocally designate the size of

10  trees which may be removed.  *See, e.g.,* 16 AR 5793, 5948

11  (specifying that "no tree larger that 29.9 inches in diameter at

12  breast height (DBH) is designated for cutting under this

13  contract...").  Because such provisions unambiguously "designate"

14  the size of trees to be cut, there is no room for discretion on

15  the part of the timber purchaser.  There is no violation of the

16  NFMA in the designation provided for within the MVP.

17

18  C.  Availability of Injunctive Relief

19

20      Plaintiffs, in seeking declaratory judgment that the MVP

21  cannot proceed without first preparing an EIS, in essence seek

22  injunctive relief to prevent the project from going forward on

23  the basis of the EA, alone.  Plaintiffs contend that if the MVP

24

25      [18]Plaintiffs cite legislative history for Section 472a(g) to
    the effect that the Secretary of Agriculture should have
26  "sufficient flexibility" to indicate timber to be harvested "by
    designating an area in which all timber will be cut, where trees
27  to be cut will be marked, or where trees to be left will be
    marked."  S. Rep. No. 94-893 at 21.22 (1976), *reprinted in* 1976
28  U.S.C.C.A.N. 6662, 6681.

1  projects proceed in violation of the procedural mandates of NEPA,

2  as well as the substantive requirements of the QLG Act and the

3  NFMA, irreparable environmental harm will occur both because of

4  potential impacts to the California spotted owl, and because of

5  an increased risk of severe wildfire in the project area.

6      The standard governing issuance of such a permanent

7  injunction must therefore be considered.  A two-part inquiry is

8  required in that regard.  Amoco Production v. Village of Gambell,

9  Alaska, 480 U.S. 531, 542 (1987).  First, a court must determine

10 whether any statute restricts its traditional equity

11 jurisdiction.  If no such restriction is present, a traditional

12 balancing of equities must ensue to determine whether an

13 injunction is appropriate.  Id.

14     Turning first to the initial area of inquiry, the Ninth

15 Circuit has held that "[t]here is nothing in NEPA to indicate

16 that Congress intended to limit [a] court's equitable

17 jurisdiction."  Save the Yaak, 840 F.2d at 722, *citing* Northern

18 Cheyenne Tribe v. Hodel, 842 F.2d 224, 230 (9th Cir. 1988).

19 Morever, while not directly addressed in the context of the NFMA

20 and QLG Act, courts in this circuit have also assumed that

21 injunctive relief for such violations is appropriate, and the

22 parties herein do not dispute the potential availability of such

23 a remedy.  *See, e.g.,* Idaho Sporting Congress, Inc., v.

24 Rittenhouse, 305 F.3d 957, 976 (9th Cir. 2002)(NFMA); Neighbors of

25 Cuddy Mountain v. United States Forest Service, 137 F.3d 1372,

26 1382 (9th Cir. 1998)(NFMA).  Consequently this Court must proceed

27 to the second prong of the analysis and balance the equities

28 involved by considering "irreparable injury and inadequacy of

-38-

1  legal remedies." <u>Amoco Production</u>, 480 U.S. at 542.

2      The Supreme Court, in <u>Amoco Production</u>, emphasizes that in
3  environmental cases, the balance of harms typically weighs in
4  favor of issuing an injunction: "Environmental injury, by its
5  nature, can seldom be adequately remedied by money damages and is
6  often permanent or at least of long duration, i.e., irreparable.
7  If such injury is *sufficiently likely*, therefore, the balance of
8  harms will usually favor the issuance of an injunction to protect
9  the environment." <u>Id</u>. at 545, emphasis added.  Nevertheless there
10 can be no presumption of environmental harm from alleged
11 violations of an environmental statute.  *See* <u>id</u>. at 542; <u>Sierra</u>
12 <u>Club v. Penfold</u>, 857 F.2d 1318 (9th Cir. 1988).

13     The necessary assessment of whether environmental injury is
14 "sufficiently likely" in order to warrant an injunction brings to
15 play the same factors already discussed.  This Court has
16 determined above that the MVP poses no significant effect on the
17 environment either in terms of its impact to the California
18 spotted owl, or with respect to increased fire risk.  The Court
19 has granted summary judgment in favor of the Forest Service as to
20 those issues, which are the very same bases proffered by
21 Plaintiffs as justification for injunctive relief in this case.
22 Consequently, for the reasons previously stated, no "sufficiently
23 //
24 //
25 //
26 //
27 //
28 //

1  likely" environmental injury has been identified here[19] that would
2  warrant issuance of a permanent injunction prohibiting the MVP
3  from going forward in the absence of an EIS.   Without the
4  possibility of likely environmental injury, Plaintiffs cannot show
5  the requisite irreparable harm.  Moreover, because Plaintiffs have
6  not shown such likelihood, the Court need not engage in a
7  balancing of harms analysis.  *See* <u>Idaho Sporting Congress, Inc. v.</u>
8  <u>Alexander</u>, 222 F.3d 562, 569 (9th Cir. 2000).

9       Alternatively, even were it necessary to assess the equitable
10 considerations in deciding whether an injunction is indicated, the
11 requisite balancing still tips against issuance of an injunction
12 in this case.  As indicated above, Plaintiffs have failed to
13 demonstrate any irreparable harm that would factor into any need
14 to balance that harm in the first place.  Moreover, an assessment
15 of the public interest militates against injunctive relief in any
16 event.  The DFPZs to be implemented through the MVP are designed
17 to "help reduce the potential for a large, damaging wildfire to
18 move across the landscape surrounding Meadow Valley."  13 AR 4884.
19 In 1999 and 2000, two such fires directly threatened the community
20 of Meadow Valley (see fn. 5, *supra*), and reducing the risk of such
21 fires through DFPZ construction appears clearly within the public
22 interest.  In addition, the MVP seeks to promote forest

23

24       [19]Plaintiffs claim only that irreparable harm may occur "if
   the Forest Service is allowed to proceed with the Meadow Valley
25 Project in violation of the procedural requirements of NEPA and
   the substantive requirements of the QLG Act and NFMA, due to the
26 environmental harm from the loss and degradation of old forest
   areas, including suitable spotted owl habitat, as well as the
   immediate and near-term increase of the risk of severe wildfire
27 in the Project area."  Pls.' Mem. in Support of Mot. for Summ.
   J., 44:26-45:2l.  These arguments have already been rejected by
28 the Court.

-40-

1  restructuring (and a return to conditions more closely

2  approximating pre-European settlement conditions) that will

3  achieve a more fire-resilient forest in the long run by opening

4  the canopy cover to facilitate the growth of more fire resistant

5  pine species.  Such long-term fire resilience, which not only

6  reduces the risk to Meadow Valley and surrounding communities,

7  improves firefighter safety and efficiency, and reduces the

8  potential for a devastating crown fire that could ultimately

9  impact old-growth forest habitat essential for species like the

10 California spotted owl, is also in the public interest.

11

12                          **CONCLUSION**

13

14      For all the foregoing reasons, summary judgment in favor of

15 the Forest Service is granted.  The record demonstrates that the

16 EA prepared in this matter was based on a reasoned evaluation of

17 relevant factors.  Consequently, the "hard look" already taken by

18 the Forest Service through the EA is sufficient, and no EIS is

19 required.  The fact that Plaintiffs' experts may agree with the

20 conclusions reached is immaterial given the fact that the Forest

21 Service may rely upon its own expert analysis in thoroughly

22 considering the project.  Further, in the absence of demonstrating

23 that environmental injury in this case is sufficiently likely,

24 Plaintiffs have also no established entitlement to the permanent

25 injunctive relief they seek in prohibiting implementation of the

26 //

27 //

28 //

                          -41-

1   MVP pending preparation of an EIS.  Moreover, and in any event,

2   the public interest does not weigh in favor of enjoining the MVP.

3

4   IT IS SO ORDERED.

5

6   DATED: May 26, 2005

7

8

9                                MORRISON C. ENGLAND, JR

10                              UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-42-